The Court

(all the judges present) were of opinion, the statute of limitations did not run against the issue in tail, and gave judgment on the special verdict for the plaintiff.
The following argument on this case is extracted from an anonymous publication, printed in the year 1794.
As the determination of the general court arises from the construction of the statute of 21 Jac. I. c. 16. it will be proper to exhibit that clause in the statute upon which the present question turns.
Sect. 1. “No person or persons shall at any time hereafter make any entry into any lands, tenements or here* ditaments, but within twenty years next after his or their right or title, which shall hereafter first descend or accrue to the same ; and in default thereof, such persons so not entering, and their heirs, shall be utterly excluded and disabled from such entry after to be made.”
It tends much to the elucidation of a subject to have precise ideas of terms and expressions. Most of those in the law are artificial and technical. It is, therefore, necessary to be known, that the words “ right or title,” in the statute, mean a right or title of entry. (2 Salk. 422. pl. 7.) A very obvious reason for which is, that the statute of 21 Jac. I. c. 16. operates by way of bar to the remedy. Every plaintiff, before he can support an ejectment, must have a right of entry. (Sunn. Eject. 10.) If the statute, therefore, bars him from his right of entry, it bars him also from his remedy, which is now usually an action of ejectment.
But it will be necessary to explain clearly what is meant by a right of entry.
*249 A right of entry necessarily supposes an ouster of possession. (3 Bl. Comm. 167.)
_ Ouster of possession is by five several ways, to wit, by abatement, intrusion, disseisin, discontinuance and de« forcement.
An abatement is the entry of a stranger before the heir or devisee. Intrusion is the entry of a stranger before the reversioner or remainderman. Disseisin is where a stranger actually turns the right owner out of possession. Discontinuance is by the alienation of a tenant in tail; and deforcement is where the entry of a stranger was originally lawful, but his detainer is unlawful.
To these several species of injury by ouster, two remedies are annexed; first, by actual entry of the right owner, or, which has the same effect, continual claim; and, secondly, by action, (3 Bl. Comm. 174.)
“ This remedy by entry takes place in three only of the five species of ouster, viz. abatement, intrusion and disseisin: for as in these the original entry of the wrongdoer was unlawful, they may therefore be remedied by the mere entry of him who hath right. But upon a discontinuance or deforcement, the owner of the estate cannot enter, but is driven to his action; for herein the original entry being lawful, and thereby an apparent right of possession being gained, the law will not suffer that right to be overthrown by the mere act or entry of the claimant.” (3 Bl. Comm. 175.)
But this remedy by actual entry must be pursued in a peaceable and easy manner, and not with force or strong hand; or else upon complaint made to a justice of the peace, restitution of possession will be awarded under the statutes of forcible entry; besides the remedy by actual entry, even in those cases where it would-be lawful, can seldom be effectual, and the preservation of the public peace requires that such modes of remedy should be discouraged. Hence, therefore, modern writers, when they *250 speak of a right of. entry, do not mean so much a right of actual entry, as a right of recovering possession by action.
This is confirmed by a very modern author. (2 Woodd. Lect. 170.) “ There may exist a right of possession to lands in one who is not the actual possessor of them ; and such is properly called a right of entry. By the old law, there were several ways of disseising a man of his freehold. If it happened by most of these kinds, and no discontinuance was wrought, the disseisee might, during the life of the disseisor, in a peaceable manner, reenter, and recover his possession without a suit at law. From the refinements of modern civilization, and a useful regard to agriculture, it is not now allowable to ' enter and expel husbandmen from their farms, even without force. Still, however, a person in the circumstances I have described, is said to retain a right of entry; the principal present use of which distinction is to ascertain his right of bringing an action of ejectment, which otherwise he could not maintain.”
Taking it as granted, then, that the expressions right of entry and right of action, are synonymous; and that the statute operates as a bar to the action or remedy, the question is, whether the statute in such case will bar a tenant in tail as"well as a tenant in fee-simple.
There can be no doubt but that if the law has annexed inseparable incidents to any particular action, whoever brings that action must bring it subject to those incidents. There can be no instance found in the books where a tenant in tail making use of the action of ejectment, is not subject to all the rules which the law has attached to that action in cases of a tenant in fee-simple. Every tenant in tail, therefore, when a plaintiif in ejectment, as well as every tenant in fee-simple, must have a right of entry when he commences his action.
It will be proper here to state, in a short manner, the modes of acquiring an estate tail.
*251 The only methods of acquiring an estate in lands, are two, to wit, by descent or purchase.
“ Descent, or hereditary succession, is the title whereby a man, on the death of his ancestor, acquires his estate by right of representation as his heir at law. An estate so descending to the heir, is in law called the inheritance.” (2 Bl. Comm. 201.)
“ The word purchase, in legal signification, includes every kind of title to such estate, except only hereditary transmission.” (2 Woodd. Lect. 250.)
A tenant- in tail may derive his right or title, either by descent or purchase, as the case may be. (2 Bl. Comm. 201. 241.)
If he takes by purchase, it is meant here to be contended, that he being the first tenant in tail to whom the right of entry “ first accrues,” he is equally within the statute as a tenant in fee-simple.
Again. If he takes the estate tail by descent, it is meant to be proved also, that if he is the first heir in tail to whom the right of entry first descends, he is equally within the statute.
Also, (and which is the principal point in question,) that the heirs of such first tenant, or first heir, are bound by the default of such first tenant’s or first heir’s not entering.
Let us examine, in the first place, then, how far such first tenant or heir in tail, without including his heirs or issue, may be deprived of his right of entry by the twenty years’ exclusive adverse possession of another, accounting the twenty years from the time such right of entry first accrues.
“ An ejectment is a possessory remedy, and only competent where the lessor of the plaintiff may enter. There-, fore it is always necessary for the plaintiff to show that this lessor had a right to enter, by proving a possession within twenty years, or accounting for the want of it, under some of the exceptions allowed by the statute. *252 Twenty years’ adverse possession is a positive title to the defendant. It is not a bar to the action or remedy of the plaintiff only, but takes away his right of possession. Every plaintiff in ejectment must show a right of possession as well as of property.” (Burr. 119.)
It is a principle of language as well as of law, that general expressions in a statute convey a general meaning. (2 Inst. 81.) The words in the statute of 21 fiac. I. are, “ no person or persons shall make entry,” &c. Such a general expression must, no doubt, include tenants in tail as well as tenants in fee-simple. And there are no words of exception in the statute which place them in a situation, as to a right of entry, different from tenants in fee-simple.
What was just cited also- as laid down by Lord Mansfield, to wit, that “ every plaintiff in ejectment must show a right of possession, as well as of property,” is as general; and the words “ every plaintiff,” must necessarily include tenants in tail as well as tenants in fee-simple.
But if twenty years’ exclusive adverse possession takes away the plaintiff’s right of possession, and bars his action of ejectment, as, according to Lord Mansfield, it does,, such plaintiff, tenant in tail, cannot bring an ejectment, when he has lost his right of possession, which may be taken from him by the twenty years’ adverse possession, when such adverse possession has been solely against him. As these two first positions just before mentioned, are not, as I understand, denied, further reasoning upon them will be unnecessary.
We have now got to the length that such first heir or tenant in tail, to whom a right of entry first accrues, or descends, may be barred of his right of entry by twenty years’ adverse possession.
Let us next see, then, if the subsequent part of the same clause in the statute does not extend also to every successive heir in tail. “ And in default thereof, such *253 persons so not entering, and their heirs, shall be utterly excluded and disabled from such entry after to be made.” By this clause, not only the person who has lost his right of entry or possession is ever after disabled from making entry, but his heirs also.
1 hat the word heir is of general import, and will include heirs in fee-tail, as well as heirs in fee-simple, seems undeniable. (2 Stra. 731. 2 Bl. Comm. 107.) The legislature having made use of the general expression in the statute, “ his heirs,” it may fairly be inferred that it was their intention to include both kinds of heirs.
In corroboration of this, it may be observed, that it is a general rule in the doctrine of inheritances, that every person making title to lands by descent^ must show himself heir to the person last seised.
This prevails with tenants in tail as well as tenants in fee-simple, and in real actions as well as in ejectments, but in different modes. In real actions, the title must be set forth in the pleadings; in ejectments, it must be shown in the evidence.
A formedon is a real action, and is the tenant in tail’s grand writ of right. But it is laid down by Lord Coke, in Buckmeré’s Case, (8 Co. 88. b.) that “ in a formedon in the descender, the demandant ought always to make himself son and heir, or cousin and heir to him who Was last seised by force of the entail, for a later seisin of any heir in tail after shall abate the writ.” (Hob. 51. 52. 2 Bac. Abr. 590.)
Now, what is incumbent upon such plaintiff heir in tail, to show in his declaration in formedon, the same will be necessary for such plaintiff heir in tail, to show by evidence in the action of ejectment. This has been decided in the case of Thorne v. Lord and others. (2 Bl. Rep. 1100.)
Further. That every issue in tail, is to be considered as an heir, and not as a remainderman, (as was suggested,) is evident from what is laid down in Litt. 625. If *254 tenant in tail enfeoff the donor, this is not any discon» tinuance, because (as Lord Coke observes in his commentary upon that section) the donor hath the reversion immediately expectant upon the estate of the donee, and the feoffment operates as a surrender; it passes no more than it lawfully may pass. But he adds, there be tenant in tail, the remainder in tail; if tenant in tail enfeofF him in the reversion in fee, this is a discontinuance, because there is a mesne estate.
So in Seymour’s Case, (10. Co. 96. 1 Bulst. 162.) where there was a tenant in tail and a remainderman in tail, the tenant in tail bargained and sold his land, and after-wards levied a fine to the bargainee. This fine was held to bind the issue, but not the remainderman, who might claim as soon as the issue of the first entail was extinct ; for the bargain and saleeonveyed no more than what the tenant in tail could lawfully grant, which was a descendible estate during his own life, and no estate of freehold passed by the fine, that being before conveyed by the bargain and sale; but yet the fine bound the issue, because wherever a fine is levied by a person to whom the lands were entailed, and whom the issue must mention in his formedon; such fine cuts off the entail and bars the issue, but does not touch or displace the remainder* (2 Bac. Abr. 531.) But if the remainderman in such case was to let the five years’ non-claim pass, he and his issue or heirs would be for ever barred by such fine, as we shall presently show.
Again. That the issue in tail is not considered as a remainderman, appears also from the distinction of the different kinds of formedon. A formedon in the descender is the peculiar action of the issue in tail, who claims under the first donee in tail. But a formedon in the remainder lies for him only, or his representative, who takes an estate tail in remainder, expressly limited upon some precedent estate, either for life or in tail, (3 Bl. Comm. 192.) and he takes immediately from the donor. *255 The issue takes the right of inheritance by descent; the remainderman by purchase.
^ _ This shows clearly, that the estate which the issue of the tenant in tail takes, is very distinct from a remainder in tail, and that although such heir in tail takes from the donor, per formant doni, yet he takes an estate of inheritance derived through his several intermediate ancestors from the original donee. He stands, then, within the plain meaning of the word heirs, in the statute, and as such, is barred by force of the statute, where his ancestor or ancestors, through whom he derives his title, have been twenty years out of possession.
In speaking of the action of formedon, an observation occurs here which ought not to be omitted. The statute of 21 Jac. I. c. 16. in the same section before quoted, enacts, that “ all writs of formedon shall be sued and taken within twenty years next after the title and cause of action first descended or fallen, and at no time after the said twenty years.” Now, a formedon, (as before observed,) is the peculiar action of a tenant in tail, and a bar to such action applies most commonly to such claimant only. It will, then, be difficult to assign a reason why the legislature, in enacting the statute of 21 Jac. I. should by the same limitation of time, bar the tenant in tail in one kind of action, and not in another; in a formedon, and not in an ejectment.
That the laches, or neglect of the ancestor, will affect the heir in tail, under a construction of the statute of 21 Jac. I. may be fairly inferred to have been the opinion of several eminent writers upon the subject.
Mr. Runnington, in his Treatise on Ejectments, p. 14. after citing this branch of the statute of 21 Jac. I. adds, “ therefore, where there hath been no possession for twenty years, either in the lessor of the plaintiff, or his ancestors, the plaintiff in this action will be nonsuited, unless he can account for the want of it under some of the exceptions allowed by the statute.” Again, in page *256 99. “ The general rule in the issue in this action is, that whatsoever bars the right of entry is a bar to the plaintiff’s title ; therefore, the plaintiff must prove seisin within twenty years in himself or his ancestors.” So in page 106. “ The plaintiff must show that his lessor had a right to enter, by proving a possession within twenty years, in the lessor of the plaintiff, or his ancestors.
What is the obvious inference from this, but that the plaintiff must show a possession, either in himself or his ancestors, within twenty years next preceding the commencement of the action ? And this appears from other authorities which may be here cited.
Mr. Justice Butter., in his Nisi Prius, 102. after citing the statute, adds, “ therefore if the lessor of the plaintiff be not able to prove himself or his ancestors to have been in possession within twenty years before the action brought, he shall be nonsuited.” The same is recognised in 2 Esp. 134.
Now, the use to be made of this is, that if such heir must have recourse to the possession of his ancestor, where his own has been defective, to supply that deficiency and enable him to bring his action, and his ancestor is found never to have made entry, or had possession, such heir evidently suffers from the laches or neglect of his ancestor, and is bound by his ancestor’s default in not entering within the limited time.
Further. It is laid down by Lord Mansfield, in the passage before cited, (1 Burr 119.) “ that twenty years’ adverse possession is a positive title to the defendant.” To apply this, let us suppose the following case: A. disseises B. tenant in tail of a tract of land, and remains ten years in exclusive adverse possession of such land, and then B. dies at the expiration of the ten years without having made entry upon A., C. is the next heir in tail, but omits to make any entry upon A. for ten years more, and after the expiration of the last ten years makes entry upon A. Now, if Cl’s entry is lawful, how can it with propriety *257 be said that A. has gained a positive title by such adverse possession.
It will, perhaps, be said that such adverse possession must be against the heir in tail altogether, and not part of such adverse possession against his ancestor, such heir’s right of entry being per formam doni, and independent of such ancestor.
But it may be answered, that if every heir in tail has a distinct right of entry, independent of his ancestor, it is obvious that no defendant, by twenty years’ adverse possession against any one heir in tail, could gain a positive title; since it would be liable to be interrupted and destroyed by the right of entry in the next succeeding heir, and so toties quoties by every heir in succession j which would render his positive title a mere nullity.
Nor can it be said that what Lord Mansfield here lays down, relates only to tenants in fee-simple. He is speaking generally of the nature of an action of ejectment, and the operation of the statute of limitations as relative thereto. It is well known that actions of ejectment are as often brought by tenants in tail as by tenants in fee-simple, and had there been any difference in this respect between the two, is it not probable that Lord Mansfield would, in this passage, have made the discrimination ? Indeed the general silence of all the cases in the books, as to any difference subsisting between tenants in fee-simple and tenants in tail, from the operation of this part of the statute of 21 Jac. I. c. 16. is a strong argument to show that no such difference subsists ; for it cannot be denied but that it has generally been taken and received, at least by the lawyers of this state, beyond the time of memory, that this statute was a bar to tenants in tail as well as to tenants in fee-simple. This is proved by the surprise with which all ranks of people are impressed by this late decision of the court. Now it is a rule in the construction of statutes, that “ if a statute be penned in dubious terms, usage is a just rule to construe it by, and *258 the meaning of things spoken or written must be, as it kath constantly been received to be, by common acceptation.” (Vaugh, 169. 4 Bac. Abr. 653.) But the usual construction of this statute has heretofore been, that it extended as well to tenants in tail as to tenants in fee-simple ; therefore, if the expressions are dubious, such ought still to be the construction of it.
Much analogous reasoning may be drawn from the construction which has been given to the statute 4 Hen, VII. c. 24. relative to fines of lands. This statute (after directing how often a fine levied in the common pleas shall be read and proclaimed) enacts, “ sect. 3. and the said proclamations so had and made, the fine to be a final end, and conclude r • well privies as strangers to the same, except women covert, other than being parties to the said fine; and every person then being within age of twenty-one years, in prison or out of the realm, or not of whole mind at the time of the said fine levied, not? parties to such fine.”
“ Sect. 4. And saving to every person or persons, and to their heirs, other than the parties in the said fine, such right, claim and interest, as they have to or in the said lands, tenements or other hereditaments, at the time of such fine engrossed, so that they pursue their title, claim or interest by way of action, or lawful entry, within five years next after the said proclamations had and made.”
“ Sect. 5. And also saving to all persons such action,. right, title, claim and interest, in or to the said lands, tenements or other hereditaments, as first shall grow, remain or descend, or come to them, after the said fine engrossed, and proclamation made by force of any gift made in the tail, or by any other cause or matter had and made before the said fine levied, so that they take their- action, or pursue their said right or title, according to the law, within five years next after such action, right, claim, title or interest to them accrued, descended, fallen or come.”
*259 In order to show the application of this statute, it is to be observed, that the persons whose right is barred by the fine, are either parties, privies or strangers.
The parties are either the cognisors or cognisees ; and that these are barred is plain, and admits of no doubt.
The privies understood and intended by this act, are those who are privy not only in blood to the conusor, but likewise in estate and title to the land of which the fine was levied, that is, those who must necessarily mention the conusor, and convey themselves through him before they can make out their title to the estate. (2 Bac. Abr. 530.)
Strangers to a fine are all other persons in the world, except only parties and privies ; and these are also bound by a fine, unless within five years after proclamations made, they interpose their claim; provided they are under no legal impediments, and have then a present interest in the estate.
The impediments are coverture, infancy, imprisonment, insanity and absence beyond sea; and these have five years allowed them to put in their claims after such impediments are removed. Persons also who have not st present, but a future interest only, as those in remainder or reversion, have five years allowed them to claim in, from the time that such right accrues, and if within that time, they neglect to claim, all persons whatsoever (that is, they and their heirs, or issue) are barred for ever. 2 Bl. Comm. 355, 356.
Hence, then, a manifest difference will arise when the -fine is levied by a tenant in tail to whom the issue is privy in blood and estate, and when by a disseisor, discontinuee, pr other person to whom the issue is a stranger.
As in the first instance the issue' is not barred by the limitation óf time in the statute 4 Hen. VII. but by reason of his privity in blood and estate, and because he must necessarily mention such conusor in making out *260 Ms title, cases on that head are not so immediately ap« plicable to a construction of the statute of 21 Jac. I.
But where the issue is a stranger to him who levies the. fine, and yet is adjudged to be barred by such fine, as such bar must arise solely from the laches or neglect of his ancestor in making claim «within the five years, cases to that purpose must furnish a suitable rule for the construction of the statute 21 Jac. I. c. 16.
The leading case on this subject seems to be that of Stowel v. Zouch, Plowd. 355. in which it was adjudged, that where a disseisor levied a fine with proclamations, and disseisee after three years, and within five years, died, his heir being within age, who after the five years expired, became of full age, and within a year after his full age entered, that his entry was not lawful, for the five years given by the statute of 4 Hen. VII .first attached in Ms ancestor, and in such case being once commenced, there shall not be any intermission or interruption of them, but their heir, though within age, must claim within those five years, or he shall be barred, and he shall not. have other five years after his full age.
In the arguments of the judges in this case, great stress was laid upon the word first in the statute of 4 fien. VII. That the right of entry first accruing or coming to the ancestor, after the disseisin and fine levied, and he not pursuing such his right within the limited time prescribed by the statute of 4 Hen. VII. to wit, within five years after the levying the fine, it was adjudged that his heir was bound by his laches or neglect, in not entering as he might.
It is true, that the case of Stowel v. Zouch was the case of an heir in fee-simple; but in page 374. in the same case, that of an heir in tail was put: "If tenant in tail be disseised, and afterwards the disseisor levies a fine with proclamations, and five years pass without claim, and afterwards the tenant in tail dies, in this case Dyer and Catline said that the issue in tail is bound'for *261 ever, for there the tenant in tail had the present right at the time the fine was levied, and the first saving comprised him and his heirs in tail, and inasmuch as they did not pursue their right within the five years according to the condition of the first saving, the tail is bound for ever.” It is true that Southcote and Weston,, Judges, were of a contrary opinion, for they said that every issue in tail shall have five years, for a new right is come to every one of them per formam, doni, which right (as they took it) the makers of the act intended to preserve, and to this purpose the words (by force of any gift in tail) were put in the second saving. But this opinion of theirs was utterly disallowed by the said chief justices ('Dyer and Cat-line,) who said “ that the word first, which ought to be added to the word descend, and then it would be, shall first descend, will not suffer every descent to have five years.”
This opinion of Dyer and Catline has been adopted and confirmed in the case of Penystone v. Lyster; (Cro. Eliz. 896. Noy, 46.) in which case, as it is reported in Cro. Eliz. a distinction is taken strongly illustrative of the present subject. “ It was resolved, that where tenant in tail bargained and sold lands in fee, the bargainee levies a fine with proclamations, five years pass in the life of the bargainor, and afterwards he dies, that this fine shall not bar the issue in tail; but that he shall have a new five years after the death of his father; for the father, by his bargain and sale, had given all his right, and against that he could not enter to avoid the fine; and then, when he died, his issue is the first to whom the right descended, wherefore he is within the saving of the statute. But if tenant in tail had been only disseised, and the disseisor had levied a fine, and the tenant in tail had suffered the five years to pass without claim, that shall bind his issue; for the tenant in tail had a right at the time of the fine levied, and, therefore, the issue is not within the saving.”
It cannot be denied, but that the irresistible implica *262 tion from this case is, that if the issue of the bargainor, to whom the right of entry in such case first accrues or descends, neglects to make claim or entry within the time limited, his issue are for ever barred; for the only reason that prevented the tenant in tail from being barred was, that he was estopped by his own bargain and sale from making entry, and then the issue of such bargainor was the first to whom that right accrued or descended ; but if such issue neglects, his issue will not be the first to whom the right accrues, and will, therefore, be barred, which is proved by the case put of the disseisor.
The same law is stated and confirmed in the case of fines. 3 Co. 87. and in 2 Bac. Abr. 532.
The law is the same also with respect to the issue of a remainderman in tail, which was established in a case as far back as in the Tear Book of 19 Hen. VIII. 6. b. reported also in Dyer, 3. This case appears to have been not long after the making the statute of 4 Hen. VII. c. 24. and before the explanatory statute of 32 Hen. VIII. c. 36. and therefore as a construction of the statute of 4 Hen. VII. has greater weight. The case was, “ Tenant in tail levied a fine with proclamations of his land, and the five years passed in his lifetime, and after-wards he died. The question was, whether his issue should be barred by the fine or not? On account of the importance of the question, it was argued at Serjeants’’ Inn, before all the justices, three of whom thought that the issue was not barred, and that by the last saving the issue in tail is aided, for he is the first to whom the right descended after the fine levied. And although the father was party to the fine, yet the issue was neither privy nor party, for he claimed the land by the donor, and not by the donee, notwithstanding he must convey himself to the land by the father. But five other justices (among whom were the respectable names of Fitzherberty Brooke and Moore) thought contrary. For *263 the intent of the makers of the statute was not, that he who claimed by the same title, which his ancestor, who levied the fine had, should be aided: for such issue in tail is privy to the fine levied by his ancestor, through whom he derives his descent, although he be not party to the fine $ and so such issue in tail shall be barred by the fine of his ancestor. And in this case it was agreed by all the justices, that if he who is a stranger to the fine, to whom a remainder in tail or other title first accrues after the fine levied, does not put in his claim within the five years afterwards, his issue is barred by this fine for ever.,?
The principal point in this case is not altogether inapplicable. The law is not now to be doubted, but that where a tenant in tail levies a fine with proclamations, such a fine will bar his issue for ever, and that too whether the five years have elapsed or not, which is solely by reason of his privity of blood and estate - Now if the issue in tail, although he claims per formant doni from the donor, is not so independent of his ancestor the donee, but that the act of such ancestor may defeat his title, and that too by a constructive privity of blood and estate, no just reason can be assigned why such issue shall not be liable also to be affected by the laches or neglect of such ancestor, to which his privity of blood and estate may with equal reason be said to have as much relative operation.
However, it may be observed, that by the last resolution in this case in Dyer, (in which all the justices agreed,) the issue of the remainderman in tail was barred by the non-claim and laches of his ancestor, the remainderman. That part of the case, then, goes to show that an issue in tail may be barred by the laches or neglect of claim in his ancestor, under the statute of 4 Hen. VII. c. 24. considered as a statute of limitations. So an issue in tail may with equal reason be barred by the laches or neglect of claim in his ancestor, under the statute 21 Jac. I. c. 16.
*264 It is probable that in consequence of the doubt in this case, of the 19 Hen. VIII. that the statute of 32 Hen. VIII. c. 36. was not long afterwards made expressly “ for the exposition of the statute 4 Hen. VII.” But as no doubt appears to have existed, whether the issue of a stranger to him who levied the fine, as for instance, the issue of a remainderman in tail, was barred by the five years’ non-claim of his ancestor under the statute of 4 Hen. VII. it may be inferred that the statute of 32 Hen. VIII. was not intended to remedy doubts which did not exist, and that strangers to him who levies a fine are barred solely by the limitation of time under the statute of 4 Hen. VII. This idea is strengthened also, by attending to the preamble of the statute of 32 Hen. VIII. which speaks only of doubts relative to fines levied by tenants in tail, and not to fines levied by a disseisor, discontinuee, or other person to whom the issue is a stranger. In the former instance, the word privies was obscure and doubtful, and there was need of exposition; but in the latter instances, the five years’ limitation of time expressed in the savings of the statute of 4 Hen. VII. was plain and obvious. And this is supported also by what is laid down in Hob. 333. that the savings in the statute of 4 Hen. VII. were intended only for strangers, and not for privies.
As the case of Hunter v. Bourne, reported in Lutw. 779. Salk. 339. 422. Com. 93. 124. was mentioned at the time of the determination of this case in the general court, it may be proper to take some notice of that case, which, as it appears from the special verdict in Lutwyche, was shortly thus : Thomas Gwillim, tenant in tail, levied a fine sur concessit for three lives, by virtue of which the conusees entered and were seised thereof; he after-wards levied another fine to one Thomas Marrett, to the use of him the said Thomas Gwillim in fee; he afterwards, by deed of bargain and sale, conveyed the same lands to a certain Thomas Payne and his heirsand afterwards, *265 to pass the reversion in fee, released the same to Thomas Payne and his heirs; and afterwards, on the 20th of June, 1663, he died, leaving Thomas Gwillim, his son and heir, who soon afterwards died, leaving Richard Gwillim, his son and heir, who was the lessor of the plaintiff.
Thomas Payne, being seised of the'reversion aforesaid, on the 20th of September, 1661, died, leaving John Payne, his son and heir; John Payne, on the 28th September, 1661, died without issue, leaving Bourne, (the defendant,) and others, his coheirs of the reversion in fee; and afterwards, on the 17th September, 1693, the last survivor of the tenants for lives died; after whose decease, the defendant entered, upon whom the said Richard Gwillim entered, &c. And whether the entry of Richard was lawful or not was the question.
As the statute 32 Hen. VIII. c. 28. authorizes tenants in tail to make leases for three lives, the first fine levied by Thomas Gwillim was lawful, and would create a discontinuance for that period of the time only. (Co. Litt. 44. 333. a. 3 Bac. Abr. 318. 320.) Then the second fine, operating only upon the estate for lives vested in the conusees of the first fine, could not create a further discontinuance. This is evident by reflecting upon the principle of a discontinuance, which is effected only by an alienation of the right of possession, (2 Bac. Abr. 88.) the statute de donis preserving the right of inheritance to the issue. Now the tenant in tail in this case, by the first fine, h,ad conveyed his right of possession so that he had nothing more to convey by the second fine. And further, it is a rule, that in order to discontinue an estate tail, it is necessary that the party discontinuing should be actually seised by force of the entail. (1 Roll. Abr. 634. Cro. Eliz. 827. Cro. Jac. 40. H. Bl. 269.) But he had already conveyed his seisin, or possession, to the conusees of the first fine, and not being actually seised by force of the entail, he could create no further discontinuance. The estate tail, then, still remained in him, *266 ready to take place on the expiration of the three lives. But he dying before that time, to wit, on the 20th June, 1663, and the last tenant for life, on the 17th September, 1693, a period of thirty years elapsed from the death of the tenant in tail, when the right of inheritance descended, to the expiration of the lease for lives, when the right of entry accrued. By these means the issue was barred of his formedon, which was founded on the right of inheritance, but not of his ejectment, which was founded on his right of entry.
It is evident, then, that this case does not contradict any of the principles before laid down. For Richard Gwillim, the issue in tail, being the first person to whom the right of entry “ first accrued or descended,” after the expiration for the lease for lives, which was a lawful estate, and the twenty years from the time that such right of entry first accrued not being elapsed, it was held that he was not barred from his entry and action of ejectment. But I think it may be fairly inferred, that had Richard Gwillim suffered the twenty years to pass without entry or action, both he and his issue would have been barred for ever from any subsequent right of entry. For as it was held in this case, that the lapse of twenty' years from the time when the right of inheritance descended, by force of the statute, barred the issue from his remedy by the action of formedon, it would seem that the like lapse of twenty years from the time when the right of entry accrued, would also have barred the issue from his remedy by ejectment.
Nor does the distinction taken in this case between the statutes of 4 Hen. VII. and 21 Jac. I. (to wit, that the one is a bar to the right, the other to the remedy, Salk. 412.) militate against any former position herein before attempted to be established. If the bar under each statute is created by non-claim, and a default of entry within a prescribed period of time, as it is always under the statute of 21 Jac. I. and so also under the statute of 4 *267 Hen. VII. when it operates against strangers ; this their similitude of operation is sufficient to authorize a similitude of construction. And if the limitation of time, by force of a peculiar set of expressions in the one statute, is held sufficient to bar both the right of inheritance and the right of possession, á fortiori ought the like limitation of time, differing only in the number of years, by force of the same or similar expressions in the other statute, to be held sufficient to bar the right of possession only.
That the statute of 4 Hen. VII. has been looked upon as a statute of limitations, some modern authorities are not wanting to show. It is observed by Mr. Hargrave, in his notes on the first Institute, (1 Inst. 121. n. 1.) that the principal use of a fine is to shorten the usual time of limitation for asserting a right to lands. Which opinion is recognised by Mr. Wooddeson in his 30th lecture, (2 Woodd. Lec. 313.) The case of Count Duroure v. Jones (4 Durnf. & East, 300.) is full also to this purpose. In which one principal question was, whether the issue in tail was bound by a fine levied by the feoffee or bargainee of a disseisor, such issue being an infant at the time it was levied, and having been in prison shortly after he came of age, so that five years had not elapsed since he came of age, free from the disability of imprisonment ?
“ The counsel for the plaintiff contended, that the legislature intended by 4 Hen. VII. c. 24. that the parties included in the second branch of that statute, should have five years clear from every disability there mentioned, in which to prosecute their claim. The question, he said, was touched upon in Stowel v. Lord Zouch; but as there were contradictory dicta there by the judges, who were divided in their opinions, the question still remained undecided.
The counsel for the defendant insisted, that the five years began the instant he was of age, and continued *268 notwithstanding the imprisonment. That the time thus began and continued to run, was clear from the opinion of the majority of the judges in Stowel v. Lord Zouch, and from the case of Griggs v. Shane, in which the question was similar to the present, only that the subsequent disability was insanity, and not imprisonment, as in the first case. Erskine, in the last cited case, was to have shown cause against a nonsuit, but he said that the current of authorities, on looking into them, was so strong against him, that he would not pretend to argue the question. That though Brown and Saunders had said in Plowden, 366. that in such a case the fine would not run, yet that all the authorities were the other way j. and so was the determination even in that case in Plow-den. The court said he was right in giving up the point, for it was too plain to be disputed.”
Lord Kenyon. “ It is important to know how far the operation of the statute of fines extends, not only as it affects questions arising on that particular act, but as it involves in it questions arising on a very beneficial system of statutes, the statutes of limitations. For if we were to suffer any innovation on the established construction of fines, it might also endanger the uniform construction of the other statutes of limitations, which are of the greatest importance, inasmuch as they are statutes of repose. I confess I never heard it doubted, till the discussion of .this case, whether, when any of the statutes of limitations had begun to run, a subsequent disability would stop their running. If the disability would have such an operation on the construction of those statutes, it would also on the others. I am very clearly of opinion on the words of the statute of fines, on the uniform construction of all the statutes of limitations, down to the present moment, and on the generally received opinion of the profession on the subject, that this question ought not now to be disturbed.” The other j udges concurred with his lordship, and there was judgment for the defendant.
*269 Now here is a case in which an issue in tail was barred of his right by a statute of the short limitation of five years. Lord Kenyon decides expressly upon the ground of analogy to the other statutes of limitations. It is evident that he must have alluded principally to the statute of 21 Jac. I. c. 16. Then, laying the subsequent disability of imprisonment out of the case, would not the plaintiff have been barred by the five years' non-claim ? Most certainly the case is, that this issue in tail, not entering within the five years, was barred, notwithstanding the disability of imprisonment. If he was barred by this statute as a statute of limitations for five years, it is only stretching the time to twenty years, and supposing that no fine was in the case, and that he had not entered within that period, it might then be asked, what reason can be offered why the statute of 21 Jac. I. c. 16. would not have barred him also? The statute of 4 Hen. VII. in substance says, that the claimant must enter within twenty years after his title first accrues or descends. Do they not operate in a similar manner, and substantially work the same effect, differing only in the number of years ? The limitation of five years is thought sufficient, when attended with the notoriety of a fine with proclamations. But a peaceable possession for twenty years may be justly thought equivalent to such notoriety.
Nor can it be said that the heirs of Count Duroure, the issue in tail, can ever revive their claim. For construing both these statutes, as Lord Kenyon does, as part of one system of limitations, the word first, which is used in both, will have an equal and similar effect as to both. But it has been before shown, that this word first prevents “ every descent from having the five years," under a construction of the statute of 4 Hen. VII. It will of consequence also prevent “ every descent from having twenty years," under the statute of 21 Jac. I. Were it otherwise, it could not be ranked, as Lord Ken.yon expresses it, among the "statutes of repose."
*270 Pinkney, for the appellant, (in the court of appeals.) The issue in tail, being barred of his entry by an adversaiy possession of twenty years, begun and completed since the descent to him of the lands entailed, dies, leaving issue inheritab le to the tail.
Question. Is the entry, of the issue so left, into the lands entailed, taken away by the adversary possession against his ancestor ?
This question turns upon the true construction of the statute 21 Jac. I. c. 16. entitled “ An act for limitations of actions and for avoiding of suits in law.”
The last branch of the first section of that statute (upon which this point immediately depends) enacts, “ That no person or persons that now hath any right or title of entry into manors, lands, tenements or hereditaments, now held from him or them, shall thereinto enter but within twenty years next after the end of this present session of parliament, or within twenty years next after any other title of entry accrued ; and that no person or persons shall, at any time hereafter, make any entry into any lands, tenements or hereditaments, but within twenty years next after his or their right or title of entry, which shall hereafter first descend or accrue to the same; and in default thereof, such persons so not entering, and their heirs, shall be utterly excluded and disabled from such entry after to be made.”
Section 2. “ Provided nevertheless, that if any person or persons that is or shall be entitled to such writ or writs,” (formedon in descender, remainder and reverter mentioned in the first part of the section,) “ or that hath, or shall have, such right or title of entry, be, or shall be, at the time of the said right or title first descended, accrued, come or fallen, within the age of twenty-one years, &c. that then such person or persons, and his and their heir and heirs, shall or may, notwithstanding the said twenty years be expired, bring his action, or make his entry, as he might have done before this act j *271 so as such person and persons, or his or their heir and heirs, shall, within ten years next after his and their full age, &c. take benefit and sue for the same, and at no time after the said ten years.”
That I may be distinctly comprehended in the observations I am about to make upon this statute, I will begin by stating my conception of its scope and meaning, so' far as can be material to the present question.
I take its obvious sense (relative to rights of entry in virtue of estates of inheritance) to be, that if the ancestor, having right of entry, and being free from disability, neglects to enter within the time prescribed, he and all the persons whatsoever claiming the same estate by descent as heirs, or (to state the proposition negatively) not coming in by a new title, shall be for ever barred, let the particular nature or qualities of the inheritance, and the course of descent incident to it, be what they may.
Let us now see what is the nature of the doubt implied by the question proposed.
It is admitted, that the first issue in tail was himself barred of his entry by the express words of the statute, it being manifest, as to him, that he had omitted to make his entry within twenty years next after his right or title first descended or accrued.
But it has been imagined, although it is not easy to understand upon what specific ground or intelligible principle, that the next heir in tail, succeeding to the estate per formam doni, shall not be prejudiced by the laches of his predecessor, in suffering the bar to be perfected against himself, that he shall be considered as paramount to, and wholly unaffected by that bar, as much so as a remainderman or other person claiming under a new title ; and that he shall not be said to lose his title of entry by force of the statute, but by another adverse possession of twenty years, commenced and completed against himself. The same doctrine is of course extended by those who indulge the following *272 imagination to all succeeding issue, who are supposed, in infinitum, to come to the estate tail, without prejudice •' _ 1 _ J from any precedent operation of the statute against any or all of their ancestors seised of the tail.
If it were not for the grave and respectable sanction which this motion has recently received, one would think it almost too plain for argument that it is at variance with the palpable intent of the legislature, by whom the statute was formed ; that it subverts not only without necessity, but wantonly and perversely, the fixed and invariable policy of the law, in reference to estates tail, and violates every rule which that policy has from time to time produced. That it is discredited by every analogous act of parliament and judicial decision, from the passage of the statute de donis, to the present moment; that it is discountenanced in a way the most unequivocal and explicit, by other parts of this same statute; that it has no warrant whatsoever in the language of the particular provision to which it applied; that so far as judicial opinions, or those of learned men in the profession, whose labours are worthy of respect, approached the point, they are against this new conceit; and that if the most direct authorities cannot be vouched in opposition to it, it is only because it is too extravagant ever to have come into judgment, as res vexata in Westminster Hall.
That this question may be viewed in all its aspects, I will endeavour to prove under separate heads,
1. That issue in tail, whose ancestor having a. right of entry by force of the tail, lost that right by reason of twenty years? adverse possession, is in virtue thereof barred of his entry, on succeeding to the same tail, by the words of the statute.
2. That he is likewise so barred by the intent of the statute, as ascertainable by every rule and means of interpretation applicable to the case.
And to the argument upon those separate heads, I *273 will subjoin a consideration of the few cases and dicta arising out of the Statute, that can be brought to bear at all upon the subject.
1. That the issue in tail is barred by the words of the statute.
The material words (as has already been seen) are, “ That no person or persons shall, at any time hereafter, make any entry into any lands, tenements or hereditaments, but within twenty years next after his or their right or title which shall hereafter first descend or accrue to the same, and in default thereof, such persons so nos entering, and their heirs, shall be utterly excluded,” &c.
The first inquiry which necessarily presents itself on a perusal of these words, with a view to a literal exposition of them, in reference to issue in tail, is, whether the issue succeeding to the estate, take by operation of law and by descent, or in other words, as heirs ?
This, I believe, might be safely assumed; but as although it may not be wholly denied, (for that would be too marked an absurdity,) it may notwithstanding be granted in a sense so inadequate as would take from the concession all its value, I will not venture to rest it upon mere assumption. On the contrary, such is the importance of obtaining precise and accurate ideas upon this preliminary point, and the topic connected with it, and of freeing it and them from all vague and indeterminate fancies, that I hope to be excused if I bestow upon it a more detailed consideration than its very familiar nature may at first appear to justify.
It may be premised that there are only two ways in which by our law, and the law of England, a title to real property can be acquired ; descent and purchase. That issue in tail does not take by purchase, and that he therefore takes by descent, and, consequently, as heir ; for an heir is he to whom lands, tenements or hereditaments, by the act of God and right of blood, do descend of some estate of inheritance. (Co. Litt. 7. b.) A defini *274 tion which expressly includes issue in tail, unless indeed it should be said that an estate tail is no inheritance at all. Vide 2 Bl. Com. 106.
An estate tail, we are told by Littleton, derives its origin from, and is a mere modification of, the fee conditional at the common law.
Fee conditional was where lands were to one, and his lineal descendants generally, or to his male descendants only, 'in exclusion of females, or vice versa, or to his descendants by a particular wife, &c.
Hargrave & Butler’s Co. Litt. 191. a. (note.) “ The condition from which those estates took their appellation, did not prevent the fee from vesting in the donee immediately upon the gift; it only authorized the donor to re-enter if the party had not issue, or if, having issue, it afterwards failed, and neither the donee nor the issue aliened.' Upon this principle it was considered to suspend the power of alienation. But on the birth of issue, the party had the same power of alienation over the fee conditional as he had over an absolute one. The statute de donis took away this power. It did not, however, affect the estate of the donee in any other respect; the consequence of this was, that a tenant in tail was as much seised of the inheritance after the statute de donis, as tenant in fee-simple-conditional was before it. Thus, therefore, an estate of inheritance remains in the donee; but a particular description of heirs only being entitled to take under it, it received the appellation of an estate tail. Thus the fee was preserved to the issue, while there was issue to take it, and to the donor when the issue failed.” (Vide also note under 326. b. 327. a. b.)
It is plain, then, that an estate tail, as modelled by the statute de donis, was neither more nor less than the fee conditional at the common law, with the power of alienation supposed to exist on the birth of issue, disaffirmed or taken away. In every other view, the estate of a donee in tail remained the same, equal in «quantity- *275 and attributes. The course of descent was marked out and regulated by a gift in fee conditional, precisely as it now is by a gift in tail. The operation of the statute de donis was simply to secure the transmission of the estate in the course marked out and regulated, against the power which the donee had been held to possess, of intercepting it by alienation.
The statute de donis rendered the fee conditional unalienable, but it did not, therefore, make it the less an inheritance, or change the quality in which the issue succeeded to the title.
.Where indeed a new series of heirs was substituted to take the land, on failure of the series to which it was first limited, (which could not have been done at the common law,) the estate thus vested in the second series was a new estate distinct from the former; an estate by purchase; a remainder to which the substituted series did not come by any hereditary claim, or as heirs to the last taker in the former series, but as new purchasers under the original donor. Harg. Co. Litt. 326, 327.
But so long as the first series remained, each person in the line of it took completely as heir to the last taker, and to the donee as the stock or terminus, designated by the gift, exactly as he would have done before the statute; and the protection afforded by the statute to the regular passage of the estate along the path of descent prescribed, fortified the hereditary title, instead of altering its character.
Hargrave, in his observations on the rule in Shelly’s Case, published in his Law Tracts, (page 572.) has the ■following remarks : “ Though succession to fee-simple, 'and the succession to fee-tail, are both equally considered as titled by legal succession, that is, by descent, the difference being only that the inheritance in fee existed before the statute de donis, and that the inheritance in tail was a modification of the former, by that statute, in order in some degree to revive the ancient favour .to *276 the perpetuity of entails,” &c. And he adds, speaking ^ ru^e *n Shelly's Case, “ In thus equally guarding descent in fee-simple and fee-tail, from the effect of purchase, the rule only conforms to the consideration of them by our law in other respects; for it is certain, that the her itage by succession in tail is construed to come in by operation of law, and by. descent, as well as the heir taking by succession in fee-simple j and this similarity holds not only as to the privileges of descent, such as tolling of entries, but also as to other consequences so far as is consistent with the unalienable quality of an estate tail, without the aid of a fine or recovery,” &c.
It should be insisted, that the issue in tail does not take as' heir in the same manner as an heir in fee, because, by the form of the gift,, the succession to the esr tate, or the series of holders, is pointed out and fixed in. a way different from the ordinary succession in fee-simple ; it may be further urged that this was equally true, not only of a fee conditional at the common law to which the issue did incontrovertibly succeed wholly as heirs, but also of a genuine fee-simple, a? it was originally known to the law of England.
The leading canon of descent in fee-simple was exactly that by which, since the statute de donis, an estate tail general, is characterized and governed. The rule (as given by Sir William Blackstone, 2 Bl. Com. 221.) was, nomen hceredis in prima investitura expressum, tan-turn, ad descendentes ex corpore primi vasalli extenditur; et non ad collaterales nisi ex corpore primi vasalli sive stipitis descendant. Or, as the rule is elsewhere given to the same effect, frater fratri sine legitimo hcerede defuncto, in beneficio quod eorumpatris fuit, succedat: sinautemunus e fratribus a domino feudum acceperit eo defuncto sine legitimo hcerede frater ejus in feudum non succedit. (Same page of Bl. Com.)
And even now this rule retains its place among the canons of descent in fee, although an expedient has *277 long since been invented to relax and almost destroy its original effect, by means of a fiction that the feudum no-Hum shall be considered as a feud of indefinite antiquity; the first purchaser is at present merely imaginary, and of course the collaterals of the actual purchaser are, by this contrivance, let in in definitum, without appearing, however, to impeach the rule that none but the lineal descendants of the first feudatory shall be inheritable to the land. (1 Bl. Tracts, p. 40. 188. 200, 201, 202, 203. 216, 217.
In a word, an estate tail general is the genuine feudum novum of the ancient law, so far as regards the line of heirs through which it has to pass; and it would be ridiculous to maintain that the successor to the feudum novum did not come to the feud by descent alone, as the heir of the first feudatory and the last taker, merely because no collateral, not issuing from the body of the first feudatory, was inheritable to the fief.
That the issue in tail has always been subjected by the law to every consequence of heirship, so far as was consistent with the unalterable quality of his estate arising from the positive provisions of the statute de donis, (as asserted by Hargrave,) appears from a multitude of instances, some of which it may not be improper to particularize.
That he has not been subjected to all the consequences of the hereditary succession by means of which he receives the estate tail, does not arise from any mixture of purchase in the nature of that succession. It proceeds whollyfrom the unalienable character stamped upon the estate to which he succeeds by the statute de donis, or, in other words, from the express negative placed by that statute on the potestas alienandi of tenant in fee conditional.
By the positive provisions of the statute de donis, the heir in tail could not be deprived of the inheritance by the fine, feoffment, or other alienation of his ancestor, *278 nor c°uld he consistently with it be bound by any other act of his ancestor, (not being an alienation in its form.') , , , . , r , so as that such act should interrupt the passage oi the fee in the line of descent ascertained by the gift, and thus be equivalent to an alienation.
Thus the lineal warranty of tenant in tail, inserted in a release, did not rebut the issue on whom it descended in formedon, for if it had, it would have been tantamount to an alienation, and a plain evasion of the statute. (Co. Litt. 375. a.) Andalthough a bar by judgment in formedon against tenant in tail, did, by reason of the privity, bar the issue, yet if such judgment was merely covinous, although upon verdict or demurrer, the issue was not barred ; for this would have been in substance to defeat the statute de donis and to enable tenants in tail to alien by a trick. Vide Co. Litt. 393. b. 10 Rep. 38. 6 Rep. 7. b. The exemption from forfeiture for treason, so as to prejudice the issue, stood upon the same ground, as did also the exemption from elegit and extent for more than the life of the tenant in tail.
In each of the foregoing cases, and in every other that it is possible to produce, where’ the issue in tail has been adjudged to hold against the act of his ancestor, or the consequences of such an act, the unalienable quality of the estate tail in virtue of the statute de donis, and not any supposed difference between the hereditary character of an heir in tail and heir in fee, is exclusively the foundation of the decision; and accordingly the acts of tenants in tail have always been allowed their full effect against the issue in every other view than as a direct or indirect alienation of the estate.
Thus, though a lineal warranty did not rebut the issue on whom it descended in formedon, yet it barfed his entry. The reason undoubtedly was, that the transmission of the inheritance was not' cut off by merely allowing the entry to be tolled, and the tail to be discontinued, and, consequently, that the statute de donis was not at all *279 infringed by conceding this limited operation to the \tatranty. The tolling an entry was no alienation nor equivalent to one, for the'issue could still bring formedon, and be restored notwithstanding the loss of his right of entry.
Again, the feoffment of tenant in tail left the title to the inheritance untouched, and the descent of the tail in the order prescribed unimpeached j but it took away the entry of the issue in infinitum, until the tail should be recontinued by the droitural action of formedon in the descender. The same effect was worked by every species of conveyance operating by transmutation of the possession; (as a fine come ceo, &c. j) and yet if tenant in tail had not been considered from the earliest times as completely seised of the inheritance, and the issue in tail of course as coming in solely by descent, previously as a tenant and heir in fee-simple, such a conveyance for more than the life of tenant in tail would, instead of discontinuing the tail and barring the entry of the issue and of those in remainder and reversion, have been a forfeiture of the estate, and would have enabled the next taker immediately to enter for it. (Vide Hang. Co. Litt. (note,) 191.)
It is further to be remarked, that even the laches of tenant in tail might bar the entry of the issue, although they could not affect his right so as to bar his formedon Thus, if any ancestor seised of the tail were disseised, and died after a descent cast without entry or claim, the issue in infinitum lost their entry, and were put to their formedon.
The consequences of the hereditary relation between tenant and issue in tail, were not only thus allowed against the issue as far as it was. possible to extend them without direct violence to the statute de donis, but they were, on the other hand, invariably sustained in his favour where it was practicable to do so, without a departure from some general rule of law.
Thus, if a man were disseised, and the disseisor gave the same land to another in tail, and tenant in tail had *280 issue, and died seised of such estate, and the issue in tail enter by the descent, the disseisee was put to his writ of entry sur disseisin, &c. (Litt. s. 386.) So in the case of a feoffment by tenant in tail within age, the issue inheritable to the tail, although not heir general, could avoid it by entry merely without suit, upon the footing of his being privy in blood and coming to the title by descent; whereas mere privies in estate could not in general avoid it at all.
If there be tenant in tail male, who has issue two sons, and the eldest has issue a daughter, and tenant in tail dies, and the eldest son within age make a feoffment and die without issue male, the younger is special heir per formam doni, and shall avoid his mother’s feoffment, although he be not heir general, because he is privy in blood, and has the land by descent. (8 Rep. 43. Vide also 3 Rep. 90. a. 87.)
An issue in tail could always bring error to reverse his ancestor’s fine, or recovery on a judgment against him in a real action affecting the estate. Thus where tenant in tail female levied a fine, the issue female alone, by reason of the privity in blood and estate, was held entitled to reverse it and not her brother, who was the heir general. Dyer, 90. a.
That issue in tail could not take advantage of a condition broken, unless he was also heir general, arose from the settled maxim, that none but the heir at the common law could do so ; but in this respect he was in no worse plight than the heir in borough English, who was, notwithstanding, recognised as taking by descent as completely as the heir general.
Having proceeded thus far, it is now proper to notice, with some particularity, a loose saying advanced with, little accuracy of thought, which I believe has contributed in a great degree to bewilder this and every other branch of the present question, I allude to the *281 common place allegation, that issue in tail takes per formam doni, paramount his ancestor.
^This allegation, in all the shapes into which it has been, or can be, moulded, may be seen at large in Pollex-Jen’s argument, as counsel in Lord Darby’s Case, hereafter mentioned. Of those who may rely on it on the present occasion, I would desire to know what specific meaning they annex to it as applicable to this case. Do they mean to say that issue in tail takes by purchase ? If I am told they do not intend by it any such absurdity, (as Pollexfen undoubtedly did not,) I answer, that they are of course driven to admit that he takes by descent as heir, since there is no alternative but to maintain that he takes in one of these two modes and capacities; the law acknowledging no compound of both, nor any medium between them.
If I am told again, that no more is meant by this assertion than that issue in tail takes by descent in virtue of, and according to, the original donation, as one of a particular series of heirs to which the inheritance is confined by it, and that his hereditary claim under that gift has been protected from the alienation of his ancestor by a certain statute passed many centuries ago, and thus made paramount to such ancestor and his acts, I answer, that I am not bound to oppose any thing to all this, because it does not in any degree interfere with my argument, for it grants all that I wish in this place to establish, that is, that issue in tail takes by descent alone as heir.
It is of no possible importance to the question, in the form in which it now presents itself, how or why he takes as. heir, provided he does so take. It is of no importance that his hereditary title is referrible to the form of the gift, giving birth to the estate to which he succeeds, or that it was made by the statute de donis available against his ancestor’s acts ; since it is still manifest, that, it is entirely an hereditary title, with no mixture of any' *282 other quality, and that his succession to the estate by force of it is that of an heir only.
It may not be amiss here to suggest, that this idea of the heir talcing per formant doni paramount the ancestor, is müch older than the statute de donis, and formed an axiom in the English law of inheritances long before that statute was thought of.
That it governed every feudal grant by which an inheritance was created, will be seen by a perusal of Butler's masterly and learned note, already in part quoted. It is there said, and trúly said, that it was peculiar to feudal inheritances, that the heir was held to take every thing from the donor, and nothing from the donee; and it was in consequence of this peculiarity, that the ancestor could no more disinherit his successor to the fief, without his concurrence, than could a donee in tail in the reign of Edward I.
The power of alienation to the disherison of the heir, afterwards introduced, took away the consequences of this principle to a certain extent, but did not destroy the principle itself; for still, if no alienation was made, the title of the heir was exactly such as it was before, a title by descent, but deriving its being from the first donation. But from the effects of this power, as gradually enlarged for commercial purposes, the principle has at length almost ceased to be discernible, in the case of a fee-simple, from any consequences produced by it. Will any reasonable man, however, contend that during the time that this principle remained in its primitive strength, so as to operate in fee-simple, as the statute de donis has since done in estates tail, the successors to the feud did not come to it completely as heirs.
Will it be said that these successors did not take then previously, in the same character in which they would take now, simply because their ancestor could not (as he can at this time) prevent their taking at all; or because they were not then liable to be disinherited, they would *283 now, either by the voluntary or involuntary alienation of their predecessor in the feud ?
It is inconceivable that the inalienability of any inheritance should make it less an inheritance than it otherwise would be, when such is known to have been once the case of all inheritances whatever, without having deprived them in any degree of that character.
It is inconceivable, that because heirs in tail have been attempted to be sheltered, as all heirs were once sheltered, from the ancestor’s control over the estate, super-induced by modern innovations, they are therefore either heirs no longer, or at least only to a half way and undefined extent.
In a word, the character of heirship has nothing to do, and never had, in the sera of law, with the ancestor’s power of alienation. It never depended upon it in any shape, or to any degree. It existed before that power was recognised precisely as it exists now, except only that it was then universally indefeasible by the ancestor; whereas now, in the case of fee-simple, it may be annihilated by him at his pleasure. But,' even supposing that the existence or non-existence of a power of alienation in the ancestor was at all material upon such a question, do we not know that tenant in tail, at the passage of the statute 21 Jac. I. did in fact possess this power, in consequence of the supervening change of the law since the statute de donisP He could then, as he can now, alien the estate tail by fine or recovery as completely as tenant in fee can do by these or any other assurances. It may be said, indeed, that he could alien only by fine or recovery ; but surely this objection does not apply to the power itself, but simply tp the manner of exercising it. Tenant by copyhold can alien only in a specified mode; but does this prove that he has no inheritance, or less an inheritance than other tenants; or that his hereditary successor does not come in as his heir; or that such successor claims paramount his ancestor more than as heir in fee at the common law ?
*284 It is idle, then, to talk of the paramount claim of an heir in tail immediately after, and in virtue of, the statute ¿e donis, since subsequent encroachments upon that statute have altered that claim, and subjected it to the power of any ancestor seised in the tail. We might as well talk of an imaginary paramount claim now belonging to an heir in fee-simple, upon the strength of what it originally was before the statute of quia emptores, and the other emancipating laws which preceded it. This is not what was the situation of an heir in tail upon the passage of the 21 Jac. I. and if the changes which had then taken place in this situation are not to be regarded, why is it that in the case of an heir in fee, we are now to go back to the conquest, and to hold him, upon ancient feudal principles and practice, to be at this day absolutely independent of, and paramount to, the last taker of the estate ? It is high time that doctrines no longer applicable to things as they are, and therefore false, should give place to others more consonant to circumstances, and more conformable with truth; and, accordingly, we find a learned and ingenious commentator on the more ancient statutes declaring, that the real difference at this day between a tenant in tail and a tenant in fee, is merely that the former can dispose of his estate but by two modes of conveyance, while the latter may choose out of many different modes. (Barrington, 132.)
To what, then, does this paramount title of issue in tail per formam doni, and the statute de donis, amount ? To no more than this, that if his ancestor does not think proper to alien in one of the forms prescribed to him by law, the issue shall inherit according to the donation. And is not this just as true of an heir in fee r Even tenant in fee-simple cannot alien but in certain specified ways, although he can alien undoubtedly in more ways than a tenant in tail; and if he does not alien in some one of these modes, his heir will succeed to the estate according to the terms and nature of it, precisely as would an heir *285 In tail in a similar predicament. As to the exclusion of collaterals from the order of descent in tail, at this day peculiar to such descents, it has been shown that this too was originally, and for a long time, common to all inheritanees that always continued to belong to the fee-conditional, and that the final admission of collaterals in fee-simple absolute, was rather an evasion of the law by a contrivance, than any part of the law itself. Besides, it would be childish to pretend that a successor to an estate is the less an heir because certain other persons, capable of inheriting to a different sort of estate, cannot inherit to this, or vice versa. .
I might add to what has been said, a statement and comment upon the material allegations in the writ of formedon in descender j they will be found in Booth, and in 13 Vin. tit. Formedon. I will content myself with mentioning that issue in tail must, in this writ, make himself heir to the donee, (analogously to the first purchaser in fee-simple, and to the person last seised of the tail.) (8 Co. 88. b.) What more is ever done by any heir in fee-simple, it would not be easy to discover.
Upon the whole, it is evident that issue in tail succeeds to the estate tail as heir only, and takes as much by hereditary succession and operation of law, as an heir in fee-simple. It would seem to follow as a regular and inevitable conclusion, that issue in tail is within the words “ and their heirs,” in 21 Jac. I. The term“ heir,” in the statute, is nomen generalissimum, and will of course embrace heirs of every possible description known to the law, coming as such to the estate constituting the ancestor’s title of entry; if its range has no limit in context, or in the nature of the subject. Thus the above term in the statute does undoubtedly include not only heirs in fee, according to the course of the common law, but special heirs wholly out of that course, as heirs by custom, in gavelkind, and borough English, for- nobody will pretend that such customary heirs are not barred by the statute of limitations exactly as heirs general.
*286 Abstractedly, however, from the particular heir of an estate in borough English, the youngest son (living the eldest) is no more the heir of his father, than a daughter in the case of tail female (living her brother) abstractedly from the particular nature of the inheritance to which she succeeds; and he is not so much so of the eldest son succeeding to tail general, and who is completely heir at the common law, in mere reference to his father, and as such would be affected by his father’s warranty, so as to be put to his formedon without assets and be rebutted with assets.
But in relation to an estate in borough English, constituting the father’s title of entry, (in which relative sense only the statute of limitations has used, or could use, the word heirs,) the youngest son is completely the father’s heir; and therefore within the description. In the same manner, although issue in tail may not be the heir general, and certainly does not so claim, yet in relation to the estate tail forming his father’s title of entry, he is his heir, and the only person who in that quality can inherit to him.
In this statute (as in every other that at present occurs at all analogous to it) hares dicitur ab hereditate. Thus in the statute 27 Edw. I. c. 1. which.takes away the plea of partes finis nihil habuerunt from parties and their heirs, it is settled that this is not intended of an heir in blood only, but of an heir who claims the inheritance of the ancestor who levies the fine. Vide 2 Inst. 523. 8 Co. 89.
There can be no room for doubt or confusion on such a subject, but by misconceiving and distorting the obvious and incontrovertible sense in which the act of parliament uses this word heirs. As if contrary to all practices in similar cases, it had used it with reference merely to the ancestor himself, instead of with a compound reference to the ancestor and the estate, upon the footing of which he is entitled to enter.
*287 Independent of the instance of the heir in borough English, it is plain that heirs, used in the statute, has not a meaning simply personal to the ancestor, but is to take its import from the estate of which he is seised, and by virtue of which he is entitled to possession.
Thus, if lands be given to A. for life, remainder in tail to B., remainder to A.’s right heirs, here A. is tenant for life in possession, with a vested remainder in fee, (by force of the rule in Sh elly’s Case,) expectant upon his own life estate and the interposed estate tail. But although if A. should be out of possession for twenty years, his right of entry would be gone on the ground of his life estate, (with a view to which only he could have any right of entry,) yet it is certain that on his death, and the determination of B.’s estate tail, the heir general of A. might enter on the strength of the remainder in fee, now become for the first time an interest in possession, and yet such heir would be peculiarly within the words ee and his heirs,” supposing them to refer only to the ancestor ; but as he would not be heir in reference to any estate forming his ancestor’s title of entry, he would not be barred, although he certainly came to the estate by-descent, and as heir at common law.
Upon the words of the statute, then, the argument stands thus: the clause under consideration binds the persons having title of entry into any lands, tenements or hereditaments, and omitting to enter, and their heirs claiming as such the same estate, producing the title of entry. But issue in tail are such heirs, and do so claim 5 they are, by consequence, as much boupd by the letter of the clause as any other heirs whatever.
The intent of the act of parliament is a distinct consideration, and will be discussed in its proper place j the object here is to make it manifest that upon the strictest exposition that can be given to it, issue in tail is entirely within it, and this I think is already so. I will, however, fortify what I have urged upon this head by a few *288 analogous examples, which will leave no ground for reasonable doubt.
That the general term heirs has been intended in several acts of parliament of a similar class with the 21 Jac.I. (and even in the 21 Jac. I. itself,) to denote heirs of every description, as heirs general in fee-simple, customary heirs out of the course of the common law, and heirs in tail, both general and special, according to the subject matter, will appear incontestable from the following instances, which might, it is presumed, upon diligent search, be greatly multiplied. That the general term heirs has been intended in several acts of parliament of a similar class with the 21 Jac.
By the statute de finibus, 27 Edw. I. c. 1. the plea of partes finis nihil habuerunt was taken away from parties and their heirs, and it is indisputable, that although the making of this statute was only fourteen years after the statute de donis, which enacted, “ quod (as to issue in tail) finis ipso jure sit nullusfi the issue in tail, claiming the same tail by descent from the ancestor levying the fine, was by force of this statute ousted of this averment as much as an heir in fee. I refer for the proof of this to 3 Rep. 88, 89. where the doctrine is stated at large in the account of Zouch’s Case, as also to Sir T. Raymond’s argument in Lord Darby’s Case, (in his Rep. 346.) where he admits this, but couples with the admission a most gross and unpardonable error, “ that it was not in respect of the estate tail, but by reason of the natural blood between the heir and ancestor;” an assertion that is directly falsified by the authority above cited, and by every case on the subject.
The reasoning on the word heirs, in Zouch’s Case, is precisely that which I apply to 21 Jac. I. Hares dicitur ab hereditate and being a generic term, means either an heir in tail or an heir in fee, (reddenda singula singulis,) according to the inheritance residing in the ancestor of which the fine is levied. Vide 3 Co. 89. a. This instance is so directly in point, that I make no further remark upon it.
*289 By statute 4 Hen, VII. c. 24. (which will bé mófe iully observed upon hereafter,) fines are made a bar to parties, privies and strangers. I do not now mean to touch on the so much disputed construction of the word primes in this statute; I shall confine myself in this place to the words “ arid their heirs,” to be found in the two provisoes, the import of which, as they are there used, has never yet been disputed by any body.
One of the provisoes (sec. 3.) runs thus j “ and also saving to all persons such action, right, &c. in or to the said lands as shall first grow, remain, descend or come to them after the said fine engrossed, and proclamation made by force of any gift in the tail, or by any other cause or matter, had and made before the said fine levied so that they take their action or pursue their said right and title according to the law within five years after such action, &c. to them accrued,” &c.
Section 6. “ And that the said persons and their heirs may have their said action against the pernor of the pro» fits,” &c. Sect. 7. “ And if the same persons at the time of such action accrued, &c. be covert, &c. then that their said action, &c. be reserved and saved to them and to their heirs unto the time that they come to be of their full age, &c. so that they or their heirs take their said action or lawful entry, &c. within five years next after,’5 &c.
It is here to be remarked that but for the words “ and their heirs” in the saving as to coverture, &c. (sec. 7.) this saving would be wholly personal to the party to whom the right should first descend, and would not be» nefit his representative. It is by force of these words that the representative has advantage of the saving in Case of the party’s death after disability removed, and before the five years expired, and even perhaps in care of his death during the disability.
To what sort of heirs, then, do these words extend? Unquestionably to heirs of every description: to hairs *290 in tail, and to heirs in fee, both general and customary, according to the nature of the inheritance, giving to the ancestor the right of action, or the right of entry in avoidance of the fine, for the first saving (sec. 5.) relates expressly to actions, right, &c. by force of any gift in the tail,.as well as any other cause or matter, and the consequent saving (sec. 7.) has, therefore, the same relation.
The manner in which heirs in tail may be benefited by this last saving, it may be proper to illustrate by an example. If an infant in tail should discontinue in fee, and discontinué® should levy a fine with proclamations, the issue in tail would of course be the first person to whom any right of action or entry to avoid the fine could accrue j for tenant in tail could himself have no such right against his own feoffment. It would follow that the issue in tail would be within the first saving, (sec. 5.) and might avoid the fine of the discontinuee, (to which he would be a stranger,) by entering within five years after the descent to him. Again, if at the time of the descent to him he was within age, he would also be within the second saving, (sec. 7.) and if he died after his full age, and before five years expired without any entry, the statute would cast the right of entry, to defeat the fine, upon his issue; and yet such issue could have no such right by the words of the statute, if issue in tail are not equally with other heirs (on the principle that hceres dicitur ab hcereditate) sufficiently designated in a general provision of this kind by the phrase “ and their heirs."
And as to the same phrase in sec., 6. it is evident that ¿t is there also used in the like universal sense, and that it is in the same manner to be applied reddendo singula singulis, either to heirs in fee general or special, or to heirs in tail, according as the inheritance from which the right of action is to spring, is descendible to the one or the other.
The statute 32 Hen. VIII. c. 2. (the statute of limitations of that reign,) gives a year after an abatement by *291 death, of any of the writs or avowries mentioned in it, within which to renew, and it gives it to the party if he be living, and to the next heir of such person if he be dead. .
One of the writs mentioned in this statute is formedon in the remainder, which may be brought by a remainderman, either in fee or in tail. (Vide 13 Vin. 479. p. 82.) And there is no doubt under this statute, that if the formedon of tenant in tail in remainder should abate by the defendant’s death, and the demandant should die within the year and before the renewal, his issue might avail himself of the above provision as being within the expression “ the next heir of such person,” inserted to cover heirs of all sorts according to the subject matter. (Vide Brook’s Reading on 32 Hen. VIII. c. 2. p. 152.)
The same observations apply to the saving in sec. 9. of this statute, which extends the six years given to persons within age, &c. after their full age, &c. to their next heirs. The words are “ the next heir to such person or persons shall have and enjoy such liberty and .advantage to sue, &c. within six years next after the death of such person or persons now imprisoned, &c. in such manner,” &c.
By the first branch of the first section of the 21 Jac. I. c. 16. (the same statute and section upon which the present question arises,) it is enacted, “ that all writs of formedon in descender, and formedon in remainder, and formedon in reverter, at any time hereafter to be sued or brought of or for any manors, &c. whereunto any person or persons now hath, or have, any title, &c. shall be sued and taken within twenty years, &c. and after the said twenty years expired, no such person or persons, or any of their heirs, shall have or maintain any such writ,” &c. And then the clause proceeds to make a similar provision for formedons upon future titles or causes of action. That the words “ their heirs,” in this portion of the clause, apply to, and include, issue in tail as well *292 as heirs in fee both general and customary, will not be questioned.
Thus in the case of formedon in reverter, they mean heirs in fee only, either according to the course of the common law, or according to special custom, where the tenure is borough English, &c. In the case of formedon in remainder, they mean either heirs in fee or in tail, according as the remainder is fee or tail; and in the case of formedon in descender, they mean heirs in tail only; yet the words are as general here as in the second branch of the section, where the title of entry is limited, and where it is now supposed that heirs in tail are wholly out of the phraseology. In truth, the words are the same, and of course do equally cover or exclude issue in tail.
So also in the proviso (sec. 2.) of this statute, which relates to both brancnes of the first section, the words “ and .his, and their heir and heirs,” are used as a sweeping designation of heirs general and special in fee and in tail. Nor is there any attempt in this proviso to distinguish these different heirs, by any variation of the style or peculiar adaptation of the language, but they are all supposed to be, and undoubtedly are, equally reached by the same form of expression with that of which we are now inquiring into the power.
So also in section 4. of this statute, in which provision is made for the case of judgment or outlawry reversed, the right of renewal within the year is given to the party plaintiff, his heirs, executors or administrators, as the case shall require. Certainly heirs in tail succeeding to the right of renewing formedons in descender, or formedons in remainder, \vere designed to be, and are, within the words “ his heirs,” in this section.
In short, in every part of this act of parliament, where it was intended to affect or benefit in the same manner, and upon the same terms, heirs of every sort, the general term heirs, has alone been resorted tp for accomplish* *293 ing that object, and in no part of the act has any thing more specific been added to that term for the purpose of marking, with greater certainty and precision, such peculiar or special heirs as it places on a footing with heirs at common law in like circumstances.
Why it is that in the branch of the statute on which the present question occurs, the parliament should be required to be more nice and appropriate in its language than it has been in the other branches of it, or why the same words should mean less than they evidently do mean in all the other instances in which they have been used in the same act, and even in the same section, it would be well for those to show who think that they can show it.
By the 10 and 11 Wm. III. c. 14. s. 1. (for quieting men’s titles and possessions under ancient fines and recoveries, and ancient judgments,) it is enacted, that no fine, &c. shall be reversed for error, unless the writ of error be commenced, &c. within twenty years after such fine levied, &c. “ Provided, that if any person who is entitled to such writ of error shall, at the time of such title accrued, be within the age of twenty-one years, &c. then such person, his heirs, executors or administrators, (though the twenty years are expired,) may bring a writ of error for reviving, &c. so as the same be done within five years,” &c. It is obvious that this proviso intends, by the words “ his heirs,” issue in tail as well as other heirs.
The propef heir to bring error to reverse a fine, recovery or judgment in a real action, is he who would succeed to the inheritance, if such fine, &c. were out of the way. (1 Leon. 261. Dyer, 90. a.) And in pursuance of this rule, issue female, and not her brother, the heir general, shall have it in the case of tail female, where the fine, &c. affects the tail. {Idem.) And it will not be supposed that the 10 and 11 Wm. III. meant to change the law on this subject, or that it does in fact change it. *294 But if it does not change the law in this respect, it can only be because the words “ his heirs,” are sufficiently descriptive of issue in tail as well as heirs in fee, and are to depend for their precise sense, in the various cases to which they will apply, upon the nature of the inheritance affected by fine, &c. and descending from the person within age, &c. upon the party claiming to reverse it.
There is no pretence, therefore, for maintaining that issue in tail are not as well as heirs of every other kind, sufficiently indicated by, and regularly comprehended within, the words “ and their heirs,” inserted in a statute of limitations where the subject matter does not from its nature take them out of it, or where some other adequate cause does not oppose itself to such an acceptation of these words; since we have seen that various statutes of this class (and even the statute in question) have adopted these words, and none other, to include at once every species of heirs whatsoever, according as the estate to be affected should be tail or fee-simple in its ordinary form, or fee-simple according to peculiar holdings. And indeed it is difficult to imagine how the framers of these acts of parliament (and more especially of the 21 Jac, I.) could have done otherwise without descending to the deplorable pedantry of special pleaders and conveyancers-
When an act of parliament (as the 21 Jac. I.) aims (as I contend this act does) at a general regulation applicable to all inheritances in possession, and designs to place them in reference to every purpose of its provisions ' upon exactly the same level, is it to be expected that the order of descent in each their characteristic singularities, or the technical features by which they are severally marked, should be set forth in the act with the formality of a deed of settlement, or the curious minuteness of a special verdict?
When after speaking universally of any right of entry of any person or persons into lands, tenements or hereditaments, and after limiting the rights of entry so uni *295 versally spoken of relatively to the parties themselves in whom they are first vested, it proceeds to extend the consequences of this limitation to those who are afterwards to succeed to those hereditaments by descent from these parties, are we to- demand that its former universality of style shall be abandoned, although the universality of object still remains, and that the different sorts of heirs succeeding to these hereditaments, shall be distinctly mentioned and described, as if a different regulation was meant to be applied to each of them i
What reason can be assigned for inserting terms of discrimination, when no discrimination at all is desired, and when the effect of the law is wished to be commensurate with the full scope and power of its general phraseology ? Why enumerate the species, when the whole genus is contemplated; or why, after such comprehensive expressions as leave nothing to be added for the purpose of enlarging the sense, shall any thing be introduced except for the simple purpose of narrowing it ?
Where a general object is to be effected, general words are naturally resorted to. It is only when the object i-s particular and limited, that such words cease to be proper, or require the association of restrictive phrases. Thus, if this act of parliament had been designed to touch only heirs in fee, as has been supposed, it would have been a matter of obvious propriety and plain necessity, to except heirs in tail, totidem verbis, from the force of the strong general words, or otherwise to narrow the principal terms so as to suit them to such a confined intent.
But, on the other hand, to have seriously endeavoured by any additional words, to extend the term heirs so as to make it include heirs in tail, would, even if the main view of the act had been to affect such heirs, have been such a piece of outrageous absurdity as no legislature, so far as my observation goes, is justly chargeable with. Where statutes have added words of explanation, of any sort to the word heirs, it has not been for the pur *296 pose of including any species of heirs which the general term itself was not supposed to be competent to embrace, but solely to exclude certain heirs not intended to be reached. Thus the 32 Hen. VIII. c. 36. meant to affect heirs in tail only, claiming the lands whereof a fine should be levied by any to whom, or to whose ancestor they were entailed. It therefore says, that the fine shall be a bar against the persons levying the fine, “ and their heirs claiming the said lands, only by force of such entail.” The words “ and their heirs claiming the said lands,” being of universal application, might have barred not only heirs in tail, but heirs in fee, claiming a different estate, and the subsequent words were added not to comprehend heirs in tail, (for that was already done,) but to confine the act to such heirs only, and thus to except all others. In this view, particularity is not only wise but indispensable j in any other, it would be most idle and childish. But heirs in tail have not only been designated in common with heirs in fee in the before-mentioned acts of parliament, by the general term heirs j they have also been affected in common with such heirs in other acts of parliament, by equally general terms, and even more so, and that too on the letter of such acts.
By the statute de donis, it was held that issue in tail could not be prejudiced by attainder of tenant in tail for treason. By the statute 26 Hen. VIII. c. 13. it was enacted that every offender convicted of high treason, should forfeit to the crown all such lands, tenements or hereditaments, which he should have of any estate of inheritance in use or possession at the time of such treason committed, or after, &c. Estates tail were adjudged to be forfeited by this statute as being, according to Sir Wm. Blackstone, (2 Bl. Com. 118.) covertly included in the general words “ all estates of inheritance,” and yet these words, in reference to the thing, are just as general as heirs in reference to the persons to succeed to it. Estate of inheritance is nomen generalissimum, correspond *297 ent with the term “ heirs,” and if the former sufficiently denotes an estate tail, the latter as completely denotes an heir in tail. This case will be mentioned again hereafter for another purpose. Similar to the foregoing instance, is the case in Sir Thomas Jones's Rep. p. 57. reported also by Keble, and others, where, by general words in the act of oblivion, 13 Car. II. estates tail were held to be forfeited. The strongest of these words are lands, tenements, rights, interests, and all other hereditaments, lease for years, chattels real, and other things of whatsoever nature of the said Sir John, he. which he or any other person had to his use in trust for. It is evident that all these expressions might have been satisfied as well as the word “ heirs,” in the 21 Jac. I. without extending them to estates tail, so as to reach the issue, and that none of them have any peculiar reference to, or necessarily denote, an estate tail farther than for the life of the tenant. Yet they were justly held to affect such estates, and the issue claiming them, notwithstanding the trite objections founded on the statute de donis, herein before and after mentioned.
I come now to the decisions upon the statute 4 Hen. VII. c. 24. which enacted that a fine with proclamations should bar parties, privies and strangers; parties and privies immediately by the mere operation of the fine; strangers by five years’ non-claim after the accruing of their title and disabilities removed.
It will not be denied, nor was it ever denied, that the word privies is the only one to be found in this statute, which, by the most refined and constrained implication, can in any sort be applied to issue in tail, so as to bar him immediately by the fine of his ancestor. But it has been decided, and these decisions have been countenanced by the opinion of Coke and others, that issue in tail was so well described by the word privies, that, as well as an heir in fee, he was thereby brought within the statute. I am aware that it will be objected here, that *298 the decisions and opinions to which I allude, were either wholly, or in a great measure, founded upon, and influence by, the legislative exposition of the 4 Hen. VII. contained in the 32 Hen. VIII. c. 36. and are not, therefore, authorities to be relied on in this point. But to the objection I answer confidently, that at least two of the cases on the 4 Hen. VII. reported in the books, are entirely clear of the 32 Hen. VIII. and could not even have been influenced by it, the first having come before the court several years before the 32 Hen. VIII. was passed, and the second being admitted on all hands to be out of the latter statute, as being the case of an entail with reversion in the crown j and as to the opinions to which I allude, by Coke and others, they are expressly on the 4 Hen. VII. alone, taken independently of 32 Hen. VIII. The first leading case on this subject was in the 19 Hen. VIII. and is reported in 19 Hen. VIII. pl. 6. and in Dyer, 3. b.
The judges were divided. It was finally urged by Pollexfen, in Lord Darby’s Case, against the authority of this determination, that there was no case in judgment or in argument for aught that appears ; but Dyer, whose reports are deservedly held in the highest esteem for their conciseness, perspicuity and accuracy, commences the report of this case, by saying, “ Before all the judges at Serjeant’s Inn, a great question was agitated, which was,” &c. and then, after Stating the case and point, he gives the arguments and opinions of the judges on each side. The Year Book gives it as it does other adjudged cases, and Brooke (one of the judges who decided it) often quotes and relies upon it in his Abridgment. And in 3 Rep. 87. (3d Resolution,) this case is referred to as an authority upon the point there resolved. It ought to be added, too, that in 28 and 29 Hen. VIII. (according to Dyer 32. a.) the judges gave the same opinion as in 19 Hen. VIII. although with less solemnity. This is probably the case intended by Lord Hobart, in M'Williams’s Case. (Hob. 332.)
*299 The next case in which this point was formally discussed, was Murray v. Eaton & Price, 29 and 30 Car. II. reported by Skinner & Pollexfen, Sir Thomas Jones, and Sir Thomas Raymond. The cause was adjourned to the Exchequer Chamber, where it seems to have been most ably argued, not only at the bar, but by all the judges, who delivered their opinions seriatim. The title of the plaintiff (Lord Darby) depended upon two questions; 1. Whether, by 4 Hen. VII., the fine of tenant in tail barred the issue; 2. Whether, admitting this to be 30, the estate in this particular case was saved by the 24 and 35 Hen. VIII. c. 20.
The reason why the first question turned wholly on the 4 Hen. VII. was, that the reversion of the estate tail whereof the fine was levied was in the crown, and, consequently, expressly excepted out of the 32 Hen. VIII. The bar, therefore, could stand only on the 4 Hen. VII. thfe judges considered both these questions, but they were not unanimous on either. The judgment of the court was with the plaintiff, three judges out of eleven dissenting, viz. Atkyns, Gregory and Dolben, who were against the plaintiff on both points, and of course were of opinion that the 4 Hen. VII. enabled tenant in tail to bar his issue by a fine. Of the judges who were with the plaintiff, all but Jones, Charlton, and Raymond concurred with the three dissenting judges on the first point, (Vide Thomas Raymond's Rep. 359.) On that point Jones gave no decided opinion, as appears by his argument published at the end of his reports, p. 245. So that there were in fact but two judges against the bar under the 4 Hen. VII. whereas there were eight expressly in favour of it, besides the Lord Keeper North, and Saunders t Chief Justice of the King's Bench, who, on account of the lateness of their promotions, did not sit, but who signified their concurrence with the majority on the first point, as well as on the last. It is true, indeed, that the Lord Keeper appears to have relied in a *300 great degree on the construction put on the 4 Hen. VII. by the 32 Hen. VIII. and, therefore, I do not much ins;st on his opinion, which was delivered very short by Pemberton, by his direction. But none of the judges who sat in the cause, nor indeed Sir Edward Saunders, who did not sit in it, laid any stress at all upon 32 Hen. VIII. notwithstanding what Hargrave has intimated to the contrary. (Co. Litt. 121. a. note. Vide 2 Show. 123.)
It is to be observed here, that the principal force of the argument against the bar, under the 4 Hen. VII. was not that issue in tail was not privy to his ancestor levying a fine, and therefore within the words of the statute, but that, however within the general words, he was out of the intent for a variety of reasons.
The weight of these opinions will not, i. think, be much diminished by the consideration that the judgment being in effect pronounced upon the last point, the opinions on jie first point were (as Hargrave has remarked, Co. Litt. 21. note c.) extrajudicial, for it is evident from every account that we have of this case, that each of the points was fully and most ably investigatéd; that precise and elaborate opinions were delivered upon each, and since the first as well as the second point was directly in judgment, the opinion upon it cannot be likened to mere dicta or obiter sayings ; but have, and are entitled to have, all the judicial authority, although, indeed, if they should only be taken as the opinions of the profound and accomplished lawyers, by whom they were given, formed after laborious inquiry, and after hearing arguments in which no means illustrative were omitted on either side, I see no reason for declining to allow them as much respect as I can desire to claim for them, and the more especially, as other opinions to which we are accustomed to pay deference, have been in conformity with them. Lord Coke’s opinion is expressly stated in 1 Inst. 372. b. “ That issue in tail was barred by 4 Hen. VII. alone;” and Lord Nottingham, in his MS. note *301 on that passage, (published in Harg. Co. Litt. note 1.) agrees to this. Lord Hobart's opinion, given arguendo, in M‘Williams's Case, is to the same effect; (Hob. 346.) as is that also of Marwood, arguendo, in Plowden, 555. And it is said by Shower, and after him by Hargrave, that Pollexfen, who argued the case of Murray v. Eaton & Price, for Lord Darby, afterwards declared his private sentiments to be against the earl on the first point.
To counterbalance all this weight of authority, there is so little to be thrown into the opposite scale, that I do not think it necessary to stop to notice it.
Let us now see the application of these opinions to the letter of the 21 Jac. I. How they bear upon the intent will be shown hereafter. The opinions are, that issue in tail is within the scope of the word “ privies,” in the 4 Hen. VII. The question with us is, whether such issue is within the word “ heirs,” in the 21 Jac. I. If the word “ heirs,” for want of being sufficiently specific, or for any other reason, does not so denote issue in tail, as to include him within the 21 Jac. I. upon a literal interpretation of it, á fortiori, as I take it, the word “ privies” could not so denote him as to bring him within the 4 Hen. VII. upon such an interpretation. The term “ privies” is of very wide and various signification, far more so, undoubtedly, than the term “ heirs.” It is the general denomination of which “ heirs” is one of the species. It includes heirs, but it also includes a great deal more. It embraces donor and donee, lessor and lessee, lord and tenant, joint tenants, tenants of particular estates, and heir in remainder, &c. Vide 1 Inst. 271.
Any argument, therefore, against barring issue in tail, by force of the word “ heirs,” founded on the variety, generality and consequent ambiguity of its sense, applies with tenfold power to the word privies, inasmuch as the former phrase is more definite and specific than the latter, and indicates fewer objects in common with issue in tail. In truth, issue in tail was held to be comprehend *302 ed within the word“ privies,” only because it was taken in the 4 Hen. VII. to be equivalent to the word heirs. And if the word “ privies” included him because it was equivalent to the word heirs, it would be ludicrous to contend that the word heirs does not in itself include him. The course of the argument was, that although privies might be of two kinds, (privies in blood inheritable, and privies in estate merely,) yet that in this statute privies in blood inheritable only were intended, and that issue in tail was privy in blood inheritable, because he. took the land from the conusor as heir and by descent. Vide 3 Rep. 90. a.
In short, he could only be in privity to tenant in tail conusor in a line, within the 4 Hen. VII. by being heir to tenant in tail, omitting to enter within the meaning of the 21 Jac. I. and, consequently, if he was barred as a privy under the former statute, he is, ex majore ratione, barred as heir under the latter. Upon the whole, the conclusion is incontrovertible on principle, authority, and every ground of legal analogy, that issue in tail is barred by the -words of 21 Jac. I. precisely as heirs in fee by special custom, or according to the course of the common law. But,
Secondly. He is likewise barred by the manifest intent of the statute, as ascertainable by every rule and means of interpretation applicable to the case.
If any thing can be said to be settled in these times of change and innovation, when every crude and pernicious novelty has its advocates merely because it is a novelty, it may, I think, be considered as a rule that limitations for quieting the possession of real property, with which the happiness and prosperity of society are so intimately connected, are to be favoured.
Lord Coke calls the statute 32 Hen. VIII. c. 2. a profitable and necessary statute, and Holt, whose opinion it will be seldom safe to disregard, has, among other opinions, declared that the 21 Jac. I. is to be taken liberally *303 Upon what in advancement of its object. But if this statute is thus to be construe^, it is natural to ask why it is that heirs in tail are to be sheltered from its operation, when the words of it are calculated to embrace them, ground of political or legal propriety is it that in modern times estates tail, reprobated by our laws, condemned by every country in the world which commerce has enlightened, and uniformly discountenanced by English judicatures from Talt arum's Case to the present day, are all at once to be taken under the peculiar guardianship of our courts of justice, so as to be rescued by casuistical constructions, and fine spun imaginations, from the effects of an act of parliament, passed for the wisest and most beneficial purposes, whose comprehensive language plainly reaches them, and within whose mischief they indisputably fall, to say nothing of the laws of Maryland,, which have long since, as well as recently, endeavoured to unfetter them, as inconsistent with our circumstances, inimical to our commercial progress, and irreconcilable with the genius of our people and government. It need not be stated that from the reign of Edward IV. (to go no farther back) the courts in England have maintained unremitting hostility against these estates, and have been astute to emancipate and to give them all the incidents of fee-simple, by every possible expedient, instead of going out of the way to seek for the means of aggravating the mischiefs they occasioned. Even in direct opposition to the statute de donis, they had succeeded long before the reign of James I. in rendering them alienable by certain forms of transfer, and had been supported by rebutters, conclusions and discontinuances against the issue suing in formedon, or making his entry whenever it was practicable , for ingenuity to invent them. In a word, if judicial exam, pie, for whole centuries constant and invariable any influence at all, it will lead us rather to rai; structive bar against the right of an heir in ta: force and subtle inference to annihilate a bar *304 enacted by the legislature against his mere right of entry. The acts of the English parliament for a long period before the 21 Jac I. have been of a similar description, as is evident from the statutes of fines. The statutes indirectly recognising the effect of a common recovery in barring entails, the statute 26 Hen. VIII. by which they were subjected to forfeiture for treason ; the statute by which they were made liable to extent at the suit of the crown, and last of all the statute 21 Jac. I. c. 19. by which all estates tail held by bankrupts were made liable to their debts,, and directed to be sold in fee-simple for the benefit of their creditors. These general considerations will undoubtedly dispose us not only to condemn any subtlety of construction on this occasion in favour of issue in tail, as distinguished from other heirs, but also to sustain such an interpretation as will give effect to the bar against him in common with heirs in fee, if the language of the statute will (as it has been shown it will) bear us out in it.
Let us now inquire, then, whether there exist any particular grounds (as it is obvious there are no general ones arising from acknowledged judicial. or legislative partiality to the inheritances in question, or from the nature of a statute of limitations with reference to the manner in which it should be construed) upon which issue in tail should be interpreted out of that part of this statute, which regulates titles of entry.
That there is any thing in the act of parliament itself, which will justify a supposition that issue in tail was meant to be excepted from the scope of the general phraseology before remarked upon, will hardly be contended. On the contrary, such other portions of the act as can be brought to influence such a supposition at all, prove (as I have in some degree shown) the exact reverse, inasmuch as they do unequivocally use this very phraseology, and this only, to affect all heirs whatsoever, and, among the rest, heirs in tail. But this is not all; the *305 first branch of the first section of the statute limits the writ of formedon not only in reversion and remainder, but in descender, and the limitation expressly prescribed for this writ is twenty years, the same as in the second branch for titles of entry.
The statute 32 Hen. VIII. c. 2. it is to be observed, was the only statute of limitations in being at the passage of the 21 Jac. I. that statute having repealed all that wentbefore it. The 32 Hen. VIII. while it limited the writ of right of tenant in fee to sixty years, and his possessory remedies of writs of entry, assise, mort d'ancestor, &c. to thirty or fifty years, according to the seisin upon which he counted, and the formedon in remainder and reverter to fifty years from the accruer of the title, did not touch the formedon in descender, nor did it affect any mere title of entry whatsoever, whether founded upon an estate in fee, in tail or otherwise.
With regard to rights of entry, therefore, the 32 Heru VIII. left an heir in fee and an heir in tail upon precisely the same footing, that is, it did not meddle with them at all; but with regard to the droitural actions peculiar to these different heirs, i. e. the writ of right and the formedon in descender, it made a distinction; for it limited the writ of right of tenant in fes, but left wholly at large the formedon of issue in tail. In this state of things, the 21 Jac. I. was passed. It found the formedon in descender free from all limitation. It found it exempted from the bar by lapse of time, which had long since been applied even to the writ of right of tenant in fee. We see this statute abandon this respect which antecedent laws had shown to the formedon in the descender. “ The highest action which issue in tail can have,” (3 Bl. Com. 191.) which the books emphatically call his writ of right, that very action which was expressly given to him by the statute de donis, for the effectual protection and security of his inheritance, and without which, the mere feoffment, fine at the common law., re *306 lease, or confirmation with warranty of tenant in tail, or even a disseisin and a descent cast, would totally disinherit him and amount to a complete alienation ; we see it not only prescribe for the first time a permanent limitation for this peculiarly favoured writ, but such a limitation as was far more rigorous than that which it left applicable to the analogous remedy of tenant in fee. And is it fairly to be presumed, that the same statute intended to leave the mere right of entry of the issue in tail, which no statute had ever before distinguished from that of an heir in fee, which even the statute de donis had not professed to protect, and did not protect, which the law had always left at the mercy of the ancestor in tail, and allowed to be defeated in various modes, from all permanent limitation whatever, while in the same section it created for the right of entry of an heir in fee a limitation not more strict than it had just applied to the writ of right of issue in tail. There is such childish inconsistency, such want of plan and principle, such a conflict of jarring and discordant views in the supposition of such an intention, that it is impossible to yield to it, unless the explicit language of the statute forces it upon us. If the framers of the 21 Jac. I. had legislated in the spirit of the statute de donis, they would not have begun by weakening the great pillar of entails erected by it. If swayed by the same policy that dictated Westminster 2. they had designed to distinguish issue in tail by peculiar favour and exemptions, it was not natural they should place in the very front of the act a most precise limitation of his chief remedy, the principal muniment of his title. In so limiting the writ of formedon in the descender, the 21 Jac. I. did undoubtedly oppose itself in the most direct and unequivocal manner to the statute de donis. The statute de donis intended to make the fee conditional unalienable, and to transmit the inheritance in the course pointed out by the donation, notwithstanding any thing that should be done or suffered *307 by the ancestor to the contrary. For the accomplishment of this object, it gave to the issue the formedon in the descender, by means of which his right might, under all circumstances, be asserted. The writ thus given was remedia universalis. It lay as well where the entry was congeable as where it was not so, and it was the only remedy where the entry was gone, for issue in tail would not bring mort d'ancestor, £s?c. which was exclusively confined to heirs in fee. But as, notwithstanding the statute de donis, the entry of the issue might be barred by various alienations of his ancestor working a discontinuance, and even by his laches in certain instances, in which event the only remedy for the issue would be formedon, any narrow limitation imposed upon that remedy so as by the lapse of a few years after the accruing of it to shelter the title of the alienee from all possibility of being questioned, and thus convert his wrongful and perishable estate into a perfect, rightful and indefeasible estate, was a direct interference with, and destruction of, the avowed object of that statute. It was striking at the unalienable quality of the estate tail, by affording the means of perfecting the feoffment, &c. of the ancestor to the total disherison of the line of heirs named in the gift. It was another expedient in aid of common recoveries and fines to fritter away the statute de donis. But a permanent limitation imposed on the mere right of entry of issue in tail would have been no interference at all with that statute, since it did not guard against, or pretend to guard against, the destruction of that right, or negligence of the ancestor. The uninterrupted transmission of the inheritance, so as that it might be recovered against all impediments by the hereditary claimant in a particular form of action, expressly provided by the statute for that purpose, was the sole object of its care.
I infer from all this, that if from attachment or respect to the views of the statute de donis, or to the peculiar and paramount title of issue in tail, as modelled and protected *308 by that statute, the 21 Jac. I: had designed to favour such issue, or their claim, it would either have left both their formedon and right of entry as the 31 Hen. VIII. had left them, free from all limitation ; or if it distinguished between them at all, that it would have limited the right of entry only, and left the formedon at large. The remedy by entry could never, under the English system of conveyancing, do much for the issue in tail against his ancestor’s acts; the remedy by formedon could do every thing. The remedy by entry was feeble and subordinate, and could apply but in few instances of any importance; that by formedon was great in its force and suited to every emergency. The former was never regarded as of such consequence to the issue as to be entitled to any exclusive privileges. The latter had been made, by the statute de donis, the bulwark of his defence, and held sacred accordingly by every subsequent law.
It may be imagined that the formedon in descender at the passage of 21 Jac. I. had gone into disuse, and was therefore limited as of no real value to issue in tail, while the remedy by entry, (or rather by ejectment,) by such issue having become more frequent, was more re-? garded. As to the remedy by entry, it is obvious that it could not have become more important to issue in tail than formerly, because it was still as liable to be barred as in ancient times by the ancestor’s acts, &c. and as to formedon in descender, we need only open Lord Coke's Reports, to be satisfied that in the reigns of Elizabeth and James it was in common use; and besides, we know that in nine instanc 3 out of ten, the issue in tail must either have prosecuted that action to be restored against his ancestor’s acts, &c. or submitted to be disinherited. It is true, indeed, that formedon in descender has not of late years been much sued in England; the reason is, that conveyancing is in modern times soVell understood, and so universally transacted, by professional men, that a bar to an entail is seldom attempted without full effect. *309 and does not fall short of its object by merely working a discontinuance. It is equally true, however, that ejectment by issue in tail against his ancestor is just as rare, and it could not be otherwise, for ejectment will not lie any more than formedon where the tail is barred, and it will not be (where formedon undoubtedly would) where it is only discontinued.
But admitting for a moment that I am mistaken in supposing that there were stronger reasons for limiting the right of entry than the formedon, yet it will be difficult to show that the reverse of this is true. If we are not to believe that the parliament were governed on this occasion by mere caprice, the formedon of the issue in tail could not have been selected as a peculiar and separate subject of limitation, while the right of entry upon which a general limitation was meditated, was designed to be passed by and exempted. What rational inducement could have led to such conduct ?
Any reason founded on the nature of an estate tail, and the paramount claim of the issue, as founded on the statute de donis, upon the policy and practice of antiquity, with reference either to the estate itself, or the remedies suited and attached to it, upon any imaginable predilection for perpetuities which such inheritances were priginally called to introduce ; in a word, upon any assignable motive whatever, applicable to the subject, which could have procured to the title of entry of issue in tail an exemption from limitation, must have procured the same exemption to the formedon in descender. This is so plain, that it is waste of words to attempt to make it more so.
To press no farther, then, the limitation of the formedon in the descender, or the other considerations arising out of the statute itself, what ground is there out of the statute for presuming that the 21 Jac. I. meant any distinction in favour of the right of entry of issue in tail as opposed to that of an heir in fee ?
*310 I am willing to allow that if the statute de donis had keen recently passed, or the views of its framers had notoriously come down unimpaired to the reign of James, if no circumstances had intervened to change the whole system with regard to entails, and to make their abolition, instead of their perpetuation, an object of national as well as legislative solicitude ; in short, if estates tail had continued to be what they once were, in all their essential qualities, and it was acknowledged to be desirable to keep them so, there might be some foundation (although in my judgment very little) for such a presumption; I say very little, because even during the reigns immediately following that of Edw. I. the mere right of entry (as already remarked) of issue in tail was not considered as entitled to the distinction. But nothing of all this is true; the statute de donis had.long.ceased to be a favourite. A series of persevering innovations upon it had robbed it of all its true character and efficacy. It remained in the Statute Book a dead letter, a mere “ monument of other times.” Its mischiefs had been felt, its policy uniformly condemned, and its provisions either eluded or virtually repealed. Estates tail were, in consequence, now become less fettered than even fees-conditional at the common law, and equally alienable with fee-simples, if proper modes of assurance were resorted to. The tora of the 21 Jac. I. when commerce had already begun to be systematically encouraged, and to grow with its followei-s into credit and importance, was not suited to the revival of the feudal notions which gave birth to the statute de donis. On the contrary, the very parliament by which the statute of limitations was passed, gave to estates tail (at the same session) the severest blow they had ever experienced, by subjecting them to the payment of debts of traders equally with fee-simples. (21 Jac. I. c. 19.) And yet we are desired to infer from, I know not what chimerical premises, that this parliament brought to their labours the spirit of the *311 Barons of Westminster 2.! / “ Ipsa si vellet credulitas credere hiec non posset.”
But if this be, iu fact, any thing more than fancy, it would seem to be incumbent on those who maintain to show why it is that this spirit has not been more fortunately manifested in the language of the statute of limitations, for it has not only done that which, of all things it could have done, was most decidedly hostile to the statute de donis >• (treated the formedon in descender with marked severity;) it has not only in relation to rights of entry, adopted such unlucky terms as by their latitude of import involve heirs in tail in the like dilemma with other heirs; it has not only given a precise commentary upon the true meaning of these terms by applying them, in other parts of the statute, in a way not to be misunderstood, to issue in tail, but it has omitted to qualify them by a single syllable to be found in any line of the act so as even to make it doubtful whether such issue were intended to be included within them, far less to prove that they intended to be excepted.
That there was every reason for such an express qualification and exception, (if such was the intention,) is perfectly certain. Even if it had been a case where the general words were less strong and forcible, and where the concomitant provisions were less likely to influence their construction, it would have been no more than ordinary caution to have guarded against misconception and ambiguity, by such an explanation of them as it was easy to have inserted. But here it was so imperiously demanded by the strong nature of the general words., and by the whole context of the statute, that the omission of it is unanswerable testimony, that no qualification or exception was designed. Besides, the necessity of a positive exception of issue in tail from the operation of such words (if it was meant that they should be excepted) had been, as the framers of 21 Jac. I. could not but know, long since settled. They could not. *312 have been ignorant of the interpretation placed upon the statute 26 Hen. VIII. (which as being a penal law was not undoubtedly to be taken by equity or intendment,) in which the general words were no more applicable to estates tail than those of the 21 Jac. I. to heirs in tail ? they could not have been ignorant that this interpretation was as hostile to the statute de donis as it was possible for any interpretation to be, and that it was also against the probable intent of the parliament (the king excepted) by whom the statute was enacted; for it has been generally supposed that the lords and commons in the time of Henry VIII. were not aware that the statute of treasons, in the form in which they passed it, would touch estates tail. With this example before them, it is scarcely imaginable that they would have left the right of entry of issue in tail to the mercy of a like interpretation if they had not liked it to be made. They also knew that in several acts of parliament, the single term heirs had been inserted to include heirs in tail as well as heirs in fee, within general savings; and that in the statute de fmibus, passed when the statute de donis was in the meridian of its strength and popularity, (Vide T. Jones, 239.) this term alone had been held to oust the issue in tail, (there being no exception in the act in his favour, 3 Co. 89. a.) together with heirs in fee, of an important averment against his ancestor’s fine. But above all, the opinions upon the 4 Hen. VII. c. 24.,(herein before mentioned,) and the opposition of that statute by 32 Hen. VIII. c. 2., could not have escaped their knowledge. T hope I shall be pardoned if, on account of the importance of these opinions to this branch of the argument, I once more advert to them.
I have already stated the question under the 4 Hen, VII. to have' been, whether issue in tail were barred by mere force of the general word privies; ” and I have-shown, that if they were so barred, it could only be because it was supposed that this word as inserted in the *313 statute was equivalent to, and synonymous with, the word heirs, although in itself, and abstractedly taken, it was much more indefinite. The opinion of the five judges in the 19 Hen. VIII. confirmed by those in the 28 and 29 of the same reign, by the statute of 32 Hen. VIII. c. 2. and by the known opinions of Lord Hobart, and Lord Coke, and Manning, that issue in tail were barred by this term, as used in that statute, have been already stated; but the influence which these opinions, so confirmed, were calculated to have upon the statute of limitations, cannot appear in its proper light without a short view of the reasons in opposition to which they were pronounced, and a comparison of them with those which the present question has produced. From such a view it will be seen, 1st. That every objection that can now be suggested to construing issue in tail within the 21 Jac. I. on the footing of the term “ heirs,” applied, and was urged against including them within the 4 Hen. VII. on the footing of the word “ privies.” 2d. That various reasons exist for construing issue in tail to be out of the 4 Hen. VII. which have no application whatever to the 21 Jac. I.; of course, it will be seen that example could have been more entitled to produce upon the framers of the statute of limitations a thorough conviction of the necessity of guarded phraseology, and of restricting, by suitable expressions, the term heirs,in limiting rights of entry, if heirs in tail were not to be comprehended.
1. It need not be said that every argument turning upon the nature and qualities of an estate tail, or upon the provisions and views of the statute de donis was at least as strong under the 4 Hen. VII. as now under the 21 Jac. I. But such arguments were in fact much more applicable there than here, because there the bar went to the right of the inheritance, and to a complete and immediate alienation by fine, and the statute de donis had expressly enacted that the fine of the tenant in tail should *314 not bar the issue, but did not speak of, or protect the mere title of entry at all, which such a fine always did bar. Again, the argument against affecting issue in tail by a term of mere general signification, embracing without exclusively denoting him, was in the case under the 4 Hen. VII. stronger beyond all comparison than in the case under the 21 Jac. I. as I have before shown; and we find Pollexfen, in Lord Darby's Case, insisting upon this argument with great zeal, (Vide Pollexfen's Rep. 181, 182.) and endeavouring to fortify it by such examples as were within its power.
2. That there are many reasons for construing issue in tail within the 21 Jac. I. which did not apply to the 4 Hen. VII. (as I have above asserted,) is undeniable, for the 4 Hen. VII. furnished no reason whatever for such a construction in aid of the word privies; (but the contrary,) (Vide Sir T. Jones's argument at the end of his Reports, p. 240, 241.) whereas the 21 Jac. I. does furnish (as already proved) several such reasons of great weight for extending the word heirs, as used in the limitation of the right of entry, to the issue in tail.
3. On the other hand, the reasons against comprehending issue in tail within the 4 Hen. VII. on the strength of the word privies, which did not, and cannot, apply to a like interpretation under the 21 Jac. I. were numerous and forcible. The reason already stated, that the statute de donis had expressly declared that the fine of tenant in tail should not bar the issue, and that a positive provision in that statute ought not to be repealed by any words which could otherwise be satisfied, was much relied on by the opposers of the bar; this reason undoubtedly has nothing to do with the 21 Jac. I. But the principal reason of this class, which formed the strength of the argument against the bar under the 4 Hen. VII. (and it is almost the only one urged by Sir Thomas Jones, as the foundation of his doubts in Lord Darby's Case,) was this: the statute 4 Hen. VII. in all-respects material to the argument against the issue in *315 Sail, was little more than a mere copy of the 18 Edw. I. e. 4. and 1 Rich. III. c. 7. which never had been imap-ined to make the tenant in tail a bar to the estate, and ° . # the unquestionable object of which last-mentioned statute was simply to restore the effect of non-claim, (with an abatement indeed of its rigour at the common law,) abolished by the 34 Edw. III. and it was natural that a statute so framed upon the model of antecedent acts, and following not only their provisions, but their style, should not be carried in its construction beyond the uniformly received intent of such antecedent acts, upon the grounds of any expressions common to all of them, for of the three clauses in 4 Hen. VII. Upon which the interpretation against issue in tail has always been rested, the first and principal one (in the body of the act) which says, “ that a fine shall be final, and conclude as well parties as privies and strangers,” is almost a literal copy of a similar provision in 1 Rich. III. which was again taken from the 18 Edw. I. with only the substitution of an enacting for a declaratory style; the second, (one of the savings, sec. 9.) which, in ascertaining how a fine shall operate on persons to whom five years are given, if they do not claim within that time, says, “ that they shall be concluded in like form as parties and privies,” is a simple repetition of a like provision in 1 Rich. III. And the third, (another saving, sec. 10.) as to the plea of partes finis nihil habuerunt, which contains a saving of this plea to all persons with an exception of privies as well as parties, which is not found in 1 Rich. III. could add little to the construction against issue in tail, since it was only the same words, ‘‘ parties and privies,” which had been already used in sec. 9. by transplanting them from 1 Rich. III. and of course left the meaning of these words exactly where it found them, that is, wholly unexplained and unappropriated.
Thus, then, the 4 Hen. VII. did no more than had feeen before done by the 1 Rich. III. and even by the *316 18 Edw. I. i. e. declared afine a bar to parties and Privies' And as neither under the 18 Edw. I. (passed five years only after the statute de donis,) nor the 1 Rich. III. the word privies had been (for a period altogether of 200 years) applied to issue in tail, the argument was peculiarly forcible that the same term in the statute 4 Hen. VII. should not be so applied, although, in its real import, it would, under different circumstances, affect him, (Vide Sir T. Jones contra, ubi sup.) yet it was adjudged (as the framers of the 21 Jac. I. must have known) to comprehend issue in tail, and ex vi termini to bar him, seeing that there was nothing in the statute itself to take him out of it; but even if it had not been so adjudged, or if there had been no respectable opinions published to that effect, the exposition given to the 4 Hen. VII. by the parliament in 32 Hen. VIII. should alone have been sufficient to induce the framers of the 2 Jac. I. to confine the general word heirs, in that statute, so as to exclude heirs in tail, if in truth they intended to exclude them. In short, the interpretation given to the 4 Hen. VII. against issue in tail, under circumstances so powerfully opposing the application of the word privies to such issue, would be an unanswerable authority for my argument in this case, even if it had wholly taken place subsequent to the passage of the 21 Jac. I.; but when it is considered that this interpretation had been judicially made long before that statute, confirmed by an act of parliament in being, notoriously approved by the ablest lawyers of the kingdom, and supported by numerous analogous instances, so as to have ascertained the necessity of restricting such general words as were about to be inserted in the 21 Jac. I. if issue in tail were not designed to be brought., within it, I cannot conjecture how such an authority can be resisted, unless it could be shown that in the statute itself a qualification of these words is to be found, instead of its being incontrovertibly true, that the statute does in all its parts most plainly reject such a qualification of them, *317 and support and enforce the acceptation for which I contend.
This argument has reached a size so unusual and so unexpected by myself, that I forbear to dwell upon other topics which might be introduced into it. Its extraordinary length is to be ascribed not to the intricacy, but to the extreme simplicity of the question, which, to be illustrated at all, requires a detailed proof of the plainest principles of law, and will not allow that any thing should be assumed, for nothing can be assumed that is more clear and better established than the proposition itself.
It only remains for me to add, that I know of no direct determination of the principal question in the case. The reason, I believe, is, that it has never been doubted until it was lately doubted in Maryland, and that it never will be doubted elsewhere. One might as well search for formal decisions on the question whether the oldest son is heir to his father. If opinions are asked of English lawyers on this point, (and they have been asked,) the answer is invariable, that they never heard a question made on it, or supposed it was possible. That it is the received idea in Westminster Hall that issue in tail is barred by limitations precisely as an heir in fee; but that as the law was never disputed, it has never been solemnly adjudged. It may, however, be confidently urged, on the other hand, that no dictum, in,court or out of court, no hint or suggestion can anywhere be found in any law book, good or bad, to give the slightest colour to the opposite doctrine. And it seems to be strange that if that doctrine is maintainable at all, nothing of this sort has appeared. That there are cases in the books in which, from their circumstances, it was natural that the non-existence of the bar against the issue in tail as such would at least have been intimated by counsel, or the judges, if such an opinion had been entertained, is certain.
At June term, 1796, the court of appeals reversed the judgment of the general court.